**PRO–FOOTBALL, INC., Plaintiff,**

v.

**Suzan Shown HARJO,
et al., Defendants.**

**No. CIV.A. 99–1385(CKK).**

United States District Court,
District of Columbia.

Sept. 30, 2003.

Carolyn B. Lamm, Francis A. Vasquez, Jr., White & Case LLP, Washington, DC, Marc E. Ackerman, Robert L. Raskopf, White & Case LLP, New York, NY, Jack McKay, Shaw Pittman, Washington, DC, for plaintiff.

Aldo Noto, Dorsey & Whitney LLP, Washington, DC, for defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ................................................99

II. FACTUAL BACKGROUND ...................................99
 A. *Procedural History* ....................................99
 B. *The Present Motions* .................................101
 C. *Factual Background* ..................................102
 1. Local Rule 56.1 .................................103
 2. The Washington Redskins and this Litigation ......104
 a. *The Origins of the Trademarks at Issue* ...........104
 b. *The Challenged Trademarks* ...................105
 3. The TTAB's Findings of Fact .....................107
 a. *The Expert Linguist Testimony* .................107
 b. *The Survey Evidence* .........................109
 4. Facts Relating to Pro–Football's Laches Defense ....112

III. LEGAL STANDARD DISTRICT COURTS USE IN RESOLVING MOTIONS FOR SUMMARY JUDGMENT UNDER RULE 56 .................112

IV. DISCUSSION ...........................................113
 A. *The Evidence Below is Insufficient to Conclude that During the Relevant Time Periods the Trademarks at Issue Disparaged Native Americans or Brought Them Into Contempt or Disrepute* .............113
 1. Standard of Review ..............................114
 2. The TTAB's Disparagement Conclusion is a Question of Fact ........116
 3. The TTAB's Findings of Fact .....................119
 a. *TTAB's Findings of Fact Regarding Linguists' Testimony* ..........119
 b. *TTAB's Findings Regarding Dr. Ross's Survey* ....................119
 4. The TTAB's Legal Analysis .......................121
 a. *The Burden of Proof at the TTAB Level* ..........................122
 b. *The Meaning of "May Disparage"* ...............................124
 5. The TTAB's Finding of Disparagement .............125
 a. *Meaning of the Matter In Question* .............126
 b. *Whether the Matter in Question May Disparage Native Americans* ......................................127
 (1) *Equating the Views of the General Public with Those of Native Americans* ..............................128
 (2) *The Derogatory Nature of the Word "redskin(s)"* ...............129
 (3) *The Word "redskin(s)" as a Term of Disparagement* ...........133
 B. *Pro Football's Defense of Laches Bars Defendants' Challenge* .............136
 1. Laches as an Available Defense ...................137
 2. Substantial Delay ...............................139
 3. Notice .........................................140
 4. Prejudice ......................................142

V. SUMMARY OF ANALYSIS ..................................144

VI. CONCLUSION ...........................................145

## I. INTRODUCTION

Presently before the Court are cross motions for summary judgment in this long-running trademark cancellation case. At issue in this appeal is the decision of the Trial Trademark and Appeal Board ("TTAB" or the "Board") to cancel six federal trademark registrations involving the professional football team, the Washington Redskins, because it found that the marks "may disparage" Native Americans or "bring them into contempt, or disrepute." *Harjo v. Pro–Football, Inc.*, 50 U.S.P.Q.2d 1705, 1749, 1999 WL 375907 (Trademark Tr. & App. Bd.1999) ("*Harjo II*"). While the national debate over the use of Native American terminology and imagery as depictions for sports teams continues to raise serious questions and arouse the passions of committed individuals on both sides of the issue, the Court's decision on the motions before it does not venture into this thicket of public policy. Rather, at the summary judgment stage, the Court only assesses the legal sufficiency of the TTAB's decision and whether a laches defense is appropriate on the basis of the undisputed material facts. The Court's conclusions in this case, as to the sufficiency of the evidence before the TTAB and the applicability of the laches defense, should *not* be interpreted as reflecting, one way or the other, this Court's views as to whether the use of the term "Washington Redskins" may be disparaging to Native Americans. The conclusions in this Memorandum Opinion are in the context of an agency review proceeding and not a decision in the first instance.

The Court has reviewed the parties' extensive briefings, including both parties' motions for summary judgment, both parties' oppositions, and both parties' reply briefs. The Court has also reviewed, where appropriate, the parties' Local Civil Rule 7.1(h) statements of undisputed material facts and the oppositions to those statements. After reviewing all of these pleadings, the entire record submitted herein, the relevant case law and statutory framework, and the transcript of the July 23, 2003, motions hearing, the Court concludes that the TTAB's decision must be reversed.

## II. FACTUAL BACKGROUND

### A. *Procedural History*

Pro–Football, Inc. ("Pro–Football"), Plaintiff in the current action and Respondent in the trademark action below, holds six trademarks containing the word, or a derivative of the word, "redskin(s)" that are registered with the Patent and Trademark Office ("PTO"). In September 1992, Suzan Shown Harjo and six other Native Americans (collectively, "Defendants" or "Petitioners") petitioned the TTAB to cancel the six trademarks, arguing that the use of the word "redskin(s)" is "scandalous," "may ... disparage" Native Americans, and may cast Native Americans into "contempt, or disrepute" in violation of section 2(a) of the Lanham Trademark Act of 1946 ("Lanham Act" or "Act"). Compl. ¶ 13 (citing 15 U.S.C. § 1052(a)). Pro–Football raised several affirmative defenses in the TTAB action. These included arguments that section 2(a) of the Lanham Act unconstitutionally impinges on First Amendment speech rights, that it also contravenes Fifth Amendment due process rights, and that the Petitioners' challenge to the trademarks was barred by the equitable defense of laches. *See id.* ¶¶ 15, 17.

In a pretrial order issued in March of 1994, the TTAB struck each of those defenses. *Harjo v. Pro Football, Inc.*, 30 U.S.P.Q.2d 1828, 1833, 1994 WL 262249 (Trademark Tr. & App. Bd.1994) ("*Harjo I* "). The TTAB dismissed Pro–Football's

constitutional defenses because assessing the constitutionality of a statute is "beyond the Board's authority." *Harjo I*, 30 U.S.P.Q.2d at 1833, 1994 WL 262249. It held that the laches defense was unavailable as well, after determining that Petitioners advocated on behalf of a broad, public interest, while Pro–Football's interests were distinctly private. *Id.* at 1831, 1994 WL 262249.

On April 2, 1999, five years after issuing its pretrial order, the TTAB issued a cancellation order in which it scheduled the cancellation of the contested trademarks. *Harjo II*, 50 U.S.P.Q.2d at 1748, 1999 WL 375907. The TTAB based its decision on the conclusion that the trademarks "may be disparaging of Native Americans to a substantial composite of this group of people," and "may bring Native Americans into contempt or disrepute." *Id.*

On June 1, 1999, Pro–Football filed its Complaint with this Court, seeking "*de novo* review, pursuant to 15 U.S.C. § 1071(b), of [the TTAB's] unprecedented administrative decision." Compl. ¶ 1. Without expressly bestowing a right to *de novo* review, section 1071(b)(1) states that a party "dissatisfied with the decision of the [TTAB] . . . may . . . have remedy by a civil action." In that action, "[t]he court may adjudge . . . that a registration involved should be canceled, . . . as the facts in the case may appear." 15 U.S.C. § 1071(b)(1). Section 1071(b)(4) states that the United States District Court for the District of Columbia has jurisdiction where, as here, the defendants "resid[e] in a plurality of districts not embraced within the same State . . . ." 15 U.S.C. § 1071(b)(4).

In its complaint, Pro–Football presents five causes of action supporting its request that the Court overturn the TTAB's cancellation order. It argues first that the trademarks do not disparage Native Americans and second that they do not bring Native Americans into contempt or disrepute. Compl. ¶¶ 108–111. In the third cause of action, Pro–Football contends that section 2(a) of the Lanham Act violates the First Amendment because it is a vague, overbroad, and content-based restriction on speech. *Id.* ¶¶ 112–116. Fourth, it asserts that section 2(a) is unduly vague in violation of the Fifth Amendment. *Id.* ¶¶ 117–118. Finally, it argues that the Defendants' cancellation petition was barred by the doctrine of laches. *Id.* ¶¶ 119–120.

Defendants filed an answer to the complaint on August 30, 1999, and, subsequently, a motion seeking dismissal of Pro–Football's constitutional and laches claims or, alternatively, judgment on the pleadings with regard to those claims. After receiving thorough briefing on the motion, the Court held a motions hearing on the record on June 29, 2000, and requested limited additional briefing. The parties submitted additional briefings pursuant to that request.

On December 11, 2000, the Court denied without prejudice Defendants' motion to dismiss Pro–Football's constitutional claims as premature. *Pro–Football v. Harjo*, 57 U.S.P.Q.2d 1140, 1142–43, 2000 WL 1923326 (D.D.C.2000) ("*Harjo III* ") (finding that the doctrine of constitutional avoidance-the fundamental rule of judicial restraint-required the Court to first rule on Pro–Football's three non-constitutional claims). The Court wrote that "[t]he avoidance doctrine forecloses the Court's assessment of Pro–Football's constitutional claims on the Native Americans' motion because non-constitutional claims seeking the same relief remain unresolved." *Id.* at 1143, 2000 WL 1923326; *see also id.* at 1144, 2000 WL 1923326 ("Because the constitutionality of the challenged portion of the Lanham Act is a novel and unsettled

issue, the Court shall tackle it only if Pro–Football does not prevail on its nonconstitutional claims.").

The Court also denied without prejudice Defendants' motion on Pro–Football's laches claim. *Id.* at 1145–46, 2000 WL 1923326. The Court first observed that "the Lanham Act does not unequivocally bar laches claims and defenses raised in regard to petitions brought under section 2(a)." *Id.* at 1145, 2000 WL 1923326. Noting that the applicability of the doctrine of laches was "dependent upon the equities of the factual scenarios within which it is raised," *id.* at 1145, 2000 WL 1923326, the Court refused to dismiss Pro–Football's laches argument until the factual record could be further developed. *Id.* at 1145–46, 2000 WL 1923326.

After this ruling, the parties engaged in a protracted period of discovery on the issue of laches that spawned a series of disputes, which were sent to Magistrate Judge John M. Facciola for resolution. Magistrate Judge Facciola resolved the pending discovery issues on February 28, 2002. Pursuant to a consent request of Pro–Football, the Court extended the close of discovery until June 7, 2002, and requested that the parties jointly file their dispositive motions on July 12, 2002. However, on June 7, 2002, Defendants moved to preclude testimony or compel discovery relating to the testimony of Daniel M. Snyder, team owner of the Washington Redskins. The Court referred this motion to Magistrate Judge Facciola on June 18, 2002. While this motion relating to Mr. Snyder's testimony was still pending, on July 12, 2002, the parties filed cross motions for summary judgment. These motions became ripe on August 28, 2002.

However, given that the issue of Mr. Snyder's deposition was still pending before Magistrate Judge Facciola, the Court deferred ruling on these motions until the issue over Mr. Snyder's deposition could be resolved.

Since the Snyder deposition was not conducted until May 16, 2003, the Court postponed a motions hearing that had been originally scheduled in this case for April 25, 2003, until July 23, 2003. On July 23, 2003, the Court convened the parties for a motions hearing on the pending cross motions for summary judgment.

Immediately prior to the motions hearing, the parties submitted the Snyder Deposition transcript without any explanation or additional argument. The Court, at the July 23, 2003, motions hearing, requested that the parties submit page citations to the deposition that the parties found probative in relation to their cases. Both parties complied with this request. However, as the old saw goes, in giving an inch, the parties took a mile. Both sides filed supplemental evidence, unrequested by the Court, that the Court finds unhelpful in resolving the legal challenge. The Court accordingly strikes Pro–Football's July 25, 2003, Praecipe, Pro–Football's August 6, 2003, Supplemental Praecipe, and Defendants' Supplemental Expert Reports of Geoffrey Nunberg and Timothy J. Nantell. This material was not requested by the Court and is not helpful in resolving the current motions.[1]

## B. *The Present Motions*

These proceedings are presently before the Court on cross motions for summary judgment. Pro–Football seeks summary judgment on its first (Pro–Football's

---

1. As such, the Court grants Pro–Football's motion to strike the supplemental reports of Geoffrey Nunberg and Timothy J. Nantell. The Court also grants Defendants' request, filed in their opposition, to strike all recent submissions outside those the Court specifically requested.

trademarks do not and will not disparage Native Americans), second (Pro–Football's trademarks do not and will not bring Native Americans into contempt or disrepute), and fifth (laches) causes of action. Essentially, Pro–Football makes two main arguments: (1) assuming Defendants' petition for cancellation was timely, the dispositive evidence before the TTAB was irrelevant and therefore does not support a finding that the term "redskin(s)" may be disparaging or cause Native Americans to be brought into contempt or disrepute; and (2) Pro–Football has met the laches standard articulated by the Court and therefore the Court should order the TTAB to dismiss Defendants' petition for cancellation of the Redskins Marks under section 2(a) of the Lanham Act. Defendants have also moved for summary judgment. They argue that (1) the Court should affirm the TTAB's decision and (2) Pro–Football's laches claim should be rejected. Defendants also renew their motion to dismiss Pro–Football's constitutional claims, if the Court reaches that issue.

In the context of the first issue, whether summary judgment should be granted for either party on Pro–Football's first and second counts, the Court notes that the Lanham Act's provisions for district court review of a decision of the TTAB are fairly unique and unlike most other administrative reviews. Essentially, the Court reviews the findings of fact of the TTAB

under the substantial evidence test, which has been derived from the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Additionally, the parties are permitted to offer new evidence, and the Court may make new findings of fact based on this newly submitted evidence.[2] However, for purposes of this proceeding, the parties chose not to present any new evidence on Pro–Football's first two counts. *See* Tr. of 7/23/2003 Motions Hearing ("Tr. 7/23/2003") at 3, 8 (not disputed).

As will be examined in some detail below, the TTAB only made specific findings of fact in two areas-linguistic evidence and survey evidence. These findings are very limited, because in most instances, the TTAB merely drew from the undisputed portions of the record to make these findings of fact.[3] Indeed, the TTAB heard no live testimony and the testimony cited in its opinion merely came from deposition transcripts. For the rest of the voluminous record, the TTAB decided not to make findings of fact, and instead simply cataloged the evidence put forth by both parties. The Court, therefore, in discussing the TTAB's opinion in factual background section of this Memorandum Opinion only concentrates on the areas where the TTAB actually made findings of fact.[4]

## C. *Factual Background*

The Court now turns to the undisputed material facts of this case. First, the Court

---

2. Of course, at this summary judgment stage in the proceedings, the Court would not be permitted under the Federal Rules of Civil Procedure to make findings of fact.

3. In this sense, even though the TTAB held a cancellation proceeding, it is almost as if its decision approximates a summary judgment proceeding. However, given the fact that the TTAB treated the case as a "trial," the Court does not review the TTAB's decision as if it were made on motions for summary judgment.

4. As will be demonstrated *infra*, the TTAB's approach is problematic because the TTAB states that its entire legal conclusion is premised on "the cumulative effect of the *entire* record." *Harjo II*, 50 U.S.P.Q.2d at 1743, 1999 WL 375907 (emphasis added). However, by making minimal findings on the disputed evidence and focusing almost exclusively on the undisputed portion of the record, the TTAB's finding of disparagement is supported by inferential fact-based judgments, unsubstantiated with concrete evidentiary proof.

sets forth those facts essential to understanding this case by reviewing the trademarks that are at issue. Second, the Court discusses the factual findings made by the TTAB. Finally, the Court sets out the undisputed material facts relating to the new evidence in the record that pertains to Pro–Football's laches defense.

### 1. Local Rule 56.1

At the outset, the Court observes that the District Court for the District of Columbia has supplemented Federal Rule of Civil Procedure 56 with LCvR 56.1, which requires that each party submitting a motion for summary judgment attach a statement of material facts to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement.[5] The party opposing such a motion must, in turn, submit a statement of genuine issues enumerating all material facts which the party contends are at issue and thus require litigation. *See* LCvR 56.1. Where the opposing party fails to discharge this obligation, a court may take all facts alleged by the movant as admitted. LCvR 56.1. As the District of Columbia Circuit has emphasized, "[LCvR 56.1] places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C.Cir. 1996) (citing *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C.Cir.1988); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 406 (6th Cir.1992)). Because of the significance of this task and the potential hardship placed on the court if parties are derelict in their duty, courts require strict compliance with LCvR 56.1. *See id.* at 150 (citations omitted).

This Court strictly adheres to the text of Local Civil Rule 56.1 when resolving motions for summary judgment. *See Pro–Football, Inc. v. Harjo*, Civ. No. 99–1385 (D.D.C. February 13, 2001) (scheduling and procedures order) ¶ 6 (discussing that the parties are required to comply with Local Civil Rule 7.1(h), which is identical to Local Civil Rule 56.1); *see also Burke v. Gould*, 286 F.3d 513, 519 (D.C.Cir.2002) (district courts need to invoke Local Civil Rule 56.1 before applying it to the case). Although discretionary in the text of the Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1.

Where possible, the Court cites to the parties' statements of facts filed in accordance with Local Civil Rule 7.1(h). The Court has reviewed the record citations by

---

**5.** The Rule provides, in relevant part:

Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . In determining a motion for summary judgment, *the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.*

LCvR 56.1 (formerly known as Local Rule 108(h)) (emphasis added).

the parties to ensure that the representations made in the parties' statement are accurate. Moreover, the Court only uses the facts in a manner consistent with the approach taken by the parties in their briefing and arguments made to the Court. *See, e.g., Morgan v. Federal Home Loan Mortgage Corp.*, 328 F.3d 647, 655 n. 10 (D.C.Cir.2003).

Since much of the relevant background of this case has been already set forth in this Court's prior published opinion in this case, and in the published opinion in the proceedings below, this Court has endeavored to avoid repetition and focus only on those facts necessary for resolving the present motions for summary judgment. Having set forth these preliminaries, the Court moves to a discussion of the material facts not genuinely in dispute.

### 2. The Washington Redskins and this Litigation

#### a. *The Origins of the Trademarks at Issue*

Plaintiff Pro–Football, Inc. is a Maryland corporation with its principal place of business in Virginia. Pro–Football is the owner of the Washington Redskins, a professional football franchise located in the Washington, D.C. area, and one of the thirty-two member clubs of the National Football League ("NFL"). Pl.'s Local Civil Rule 7.1(h) Statement of Material Facts in Supp. of Its Mot. for Summ. J. ("Pl.'s Stmt.") ¶¶ 1–2; Compl. ¶ 4. On or about July 8, 1932, George Preston Marshall, along with Vincent Bendix, Jay O'Brien, and Dorland Doyle, purchased a then-inactive Boston National Football League franchise. Pl.'s Stmt. ¶ 3. Within the year, his co-owners dropped out and Mr. Marshall was left as the sole owner of the franchise. *Id.* The Boston team played the 1932 season in Braves Field, home of Boston's then-National League baseball team, and like the baseball team, were known as "The Braves." *Id.* ¶ 4. On or about July 8, 1933, Mr. Marshall officially changed the name of his franchise from the "Boston Braves" to the "Boston Redskins." *Id.* ¶ 5. Mr. Marshall chose to rename his franchise the Redskins in honor of the team's head coach, William "Lone Star" Dietz, who was a Native American. *Id.* ¶ 7.[6]

Around this time, i.e. the 1930's, the Redskins began to use the marks:

---

**6.** To support this fact, Pro–Football cites the declaration of David Pauken, the Chief Operating Officer of Pro–Football and an op-ed piece from *The Washington Post* that Mr. Pauken cites as proof of this fact. The newspaper article, entitled "My Grandfather Named the Redskins" was written by Jordan Harrison Price, Mr. Marshall's granddaughter. Defendants object to this evidence because they argue that Mr. Paulken does not have a foundation to establish this fact and the newspaper article is "inherently unreliable" since it was written many years after the event in question. Defs.' Local Civil Rule 7.1(h) Statement of Material Facts in Opp'n to Pl.'s Mot. for Summ. J. (Defs.' Opp'n Stmt.")

¶ 7. The essence of Defendants' objection is with the article itself and is not related to the fact that the article came from a newspaper. They argue that the author of the article, Mr. Marshall's granddaughter, cannot provide reliable testimony due to the passage of time.

The Court disagrees with Defendants objection to the newspaper article. They offer no compelling reason why the memories of Mr. Marshall's granddaughter would be inherently unreliable; particularly since they do not dispute other facts that also have their basis in the newspaper article. *Compare* Pl.'s Stmt. ¶¶ 3–5 *with* Defs.' Opp'n Stmt. ¶¶ 3–5. Moreover, Defendants did not introduce any evidence that would contradict this statement.

and "REDSKINS" in commerce. *Id.* ¶ 6 (observing that these marks were later registered as Registration Nos. 836,122 and 1,085,092 respectively).[7] On or about February 13, 1937, the Boston Redskins franchise moved to the Washington, D.C. area and were re-christened the "Washington Redskins." *Id.* ¶ 9. On or about September 16, 1937, the day of the Redskins' first game in Washington, D.C., the Redskins began to use the mark "WASHINGTON REDSKINS" in commerce. *Id.* ¶ 10. In or about January 1941, the Redskins started using the following marks in commerce:

*Id.* ¶ 11. In or about 1962, the Redskins started using the "REDSKINETTES" mark in commerce in connection with its cheerleaders. *Id.* ¶ 13.

b. *The Challenged Trademarks*

On July 14, 1966, the Redskins filed application serial number 72/250,227 for the mark:

for use in connection with "entertainment services-namely, football exhibitions rendered live in stadia and through the media of radio and television broadcasts" in International Class 041. *Id.* ¶ 24. On July 11, 1967, the PTO published this application for public opposition in the *Official Gazette.* *Id.* The PTO issued registration number 836,122 for this mark on September 26, 1967. *Id.*[8] On September 26, 1987, the PTO renewed the Redskins' registration for an additional twenty years. *Id.* ¶ 40.

---

7. The graphical images of the trademarks used in this opinion have been obtained by entering the registration numbers into the United States Patent and Trademark Office's Trademark Electronic Search System. This useful website is located at: http://tess2.uspto.gov/bin/gate.exe?f=tess & state=23s9ck.4.1.

8. It does not appear that Defendants dispute Pro–Football's contention that the PTO received not "a single opposition from anyone, let alone any Native American" in connection with its publication in the *Official Gazette.* Defs.' Opp'n Stmt. ¶ 24. Nevertheless, the documentary evidence submitted-which consists of the principal register of the service mark-does not indicate that oppositions were or were not received. However, since this fact is not specifically disputed the Court will accept Pro–Football's representation.

On September 11, 1972, the Redskins filed application serial number 72/435,127 for the

trademark, application serial number 72/435,243 for the "WASHINGTON

REDSKINS" trademark, and application serial number 72/435,244 for the

trademark, all for use in connection with "entertainment services-namely, presentations of professional football contests" in International Class 041. *Id.* ¶ 26. The first of these three trademarks was published in the *Official Gazette* on November 6, 1973, and the other marks were likewise published. *Id.* ¶¶ 30–31.[9] On June 18, 1974, the PTO issued registration number 986,668 for first of these three trademarks. *Id.* ¶ 33. On February 12, 1974, the PTO issued registration number 978,824 for the second of these two trademarks. *Id.* ¶ 32. On June 25, 1974, the PTO issued registration number 987,127 for the third of these trademarks. On June 18, 1994, the first of these trademarks was renewed for ten

years. *Harjo II*, 50 U.S.P.Q.2d at 1708 n. 7, 1999 WL 375907. On February 12, 1994, the PTO renewed the second of these three trademarks for ten years. *Id.* at 1707 n. 3, 1999 WL 375907. On June 25, 1994, the PTO renewed the third of these three trademarks for ten years. *Id.* at 1708 n. 8, 1999 WL 375907.

On November 26, 1976, the Redskins filed application serial number 73/107,873 for the mark "REDSKINS" for use in connection with "entertainment services-namely, presentations of professional football contests" in International Class 041. Pl.'s Stmt. ¶ 35. The PTO issued registration number 1,085,092 for this mark on February 7, 1978, following publication in the *Official Gazette. Id.*[10] On February 7,

9. Defendants clearly do not dispute Pro–Football's contention that the PTO received not "a single opposition from anyone, let alone any Native American" in connection with its publication of these three trademarks in the *Official Gazette.* Defs.' Opp'n Stmt. ¶¶ 32–34. Nevertheless, the documentary evidence submitted-which consists of the principal register of the service mark-does not indicate that oppositions were or were not received or the date the trademarks were published; with the exception of the first of these three marks where the record discloses that the trademark was published on November 6, 1973. How-

ever, since these facts are not specifically disputed, the Court will accept Pro–Football's representation.

10. It does not appear that Defendants dispute Pro–Football's contention that the PTO received not "a single opposition from anyone, let alone any Native American" in connection with its publication in the *Official Gazette.* Defs.' Opp'n Stmt. ¶ 35. Nevertheless, the documentary evidence submitted-which consists of the principal register of the service mark-does not indicate that oppositions were or were not received or the date that the

1998, this trademark was renewed for a period of ten years. *Harjo II*, 50 U.S.P.Q.2d at 1707 n. 4, 1999 WL 375907.

On October 4, 1989, the Redskins filed application serial number 73/829,272 for the mark "REDSKINETTES" for use in connection with "entertainment services, namely, cheerleaders who perform dance routines at professional football games and exhibitions and other personal appearances" in International Class 041. Pl.'s Stmt. ¶ 42. The PTO published this application for public opposition in the *Official Gazette* on April 24, 1990. *Id.* The PTO issued registration number 1,606,810 for this mark on July 17, 1990. *Id.*[11]

### 3. The TTAB's Findings of Fact

The TTAB made specific findings of fact in only two areas: (1) the testimony of expert linguists, *Harjo II*, 50 U.S.P.Q.2d at 1731–32, 1999 WL 375907, and (2) survey evidence, *id.* at 1734, 1999 WL 375907. With these two exceptions, the TTAB made no other findings of fact regarding the voluminous record and instead merely presented the evidence of each of the parties in the form of summaries. *Id.* at 1721, 1999 WL 375907 ("[E]xcept for the testimony and related exhibits of the parties' linguistics experts and marketing and survey experts, we summarize the testimony

and related exhibits of, first, petitioners' witnesses and, second, respondent's witnesses."). Again, it should be noted that the testimony supporting these findings was in the form of depositions and not in the form of live testimony before the finders of fact. The Court now turns to these findings.[12]

#### a. *The Expert Linguist Testimony*

During the proceedings below, Petitioners presented the testimony of Geoffrey Nunberg, a linguistics expert, while Pro–Football presented the testimony of David Barnhart and Ronald Butters, who also are linguistics experts. *Id.* at 1728, 1999 WL 375907. The experts explained that linguistics is "the study of language and its uses, both generally and within particular populations or historical contexts; and that lexicography is the branch of linguistics concerned with the meaning of words with respect to the production of dictionaries." *Id.* The Board then summarized the testimony of these experts. *Id.* at 1728–31, 1999 WL 375907. After compiling this summary, the TTAB essentially made five findings of fact regarding the linguists' testimony. These findings of fact are:

1. "There is no dispute among the linguistics experts that the word 'reds-

---

trademark was published. However, since these facts are not specifically disputed the Court will accept Pro–Football's representation.

**11.** It does not appear that Defendants dispute Pro–Football's contention that the PTO received not "a single opposition from anyone, let alone any Native American" in connection with its publication in the *Official Gazette*. Defs.' Opp'n Stmt. ¶ 42. Nevertheless, the documentary evidence submitted-which consists of the principal register of the service mark-does not indicate that oppositions were or were not received. However, since this

fact is not specifically disputed the Court will accept Pro–Football's representation.

**12.** The Court has compiled this section primarily from the actual opinion of the TTAB. Defendants discuss the TTAB's Findings in their 7.1(h) statement. Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Stmt.") at 5–7. However, Defendants compiled these findings from the portion of the TTAB's opinion where it applied the law to these facts to reach legal conclusions. The Court reviews the TTAB's ultimate finding-that the trademarks at issue "may disparage" Native Americans-in the context of its own Discussion section *infra*.

kin(s)' has been used historically to refer to Native Americans, and is still understood, in many contexts, as a reference to Native Americans." *Id.* at 1731, 1999 WL 375907.

2. "[F]rom at least the mid–1960's to the present, the word 'redskin(s)' has dropped out of written and most spoken language as a reference to Native Americans." *Id.*

3. "[F]rom at least the mid–1960's to the present, the words 'Native American,' 'Indian,' and 'American Indian' are used in spoken and written language to refer to Native Americans." *Id.*

4. "[F]rom at least the mid–1960's to the present, the word 'redskin(s)' appears often in spoken and written language only as a reference to respondent's football team." *Id.*

5. "The experts agree the evidence of record establishes that, until at least the middle of this century, spoken and written language often referred to Native Americans in a derogatory, or at least condescending, manner and that references to Native Americans were often accompanied by derogatory adjectives and/or in contexts indicating savagery and/or violence." *Id.* (noting that "[t]here is no dispute that, while many of these usage examples refer to Native Americans as 'Indians,' the word 'Indian' has remained in the English language as an acceptable reference to Native Americans during the second half of this century").

Importantly, in making these findings of fact, the TTAB specifically indicated where it was declining to make certain findings of fact regarding the linguistic expert testimony. First, with regard to the testimony of the experts "about the denotation and connotation of 'redskin(s)' as a reference to Native Americans and as it appears in the name of respondent's football team," the TTAB found that "[t]o some extent, this testimony is self-serving and the opinions of the different individuals seem to negate each other's assertions, which offsets whatever probative value could be attributed to this portion of their testimony." *Id.* at 1731, 1999 WL 375907. Second, with regard to the question of "significance of the word 'redskin(s)['] in written and spoken language from the 1960's to the present, both as a reference to Native Americans and as part of the name of respondent's football team," the TTAB reasoned that this testimony reached the ultimate legal inquiry that was before the TTAB and therefore was not considered in rendering its decision. *Id.* Third, the TTAB noted that in reaching their conclusions, the experts made statements that required "scrutiny." *Id.* at 1732, 1999 WL 375907. The TTAB stated:

> For example, while respondent's linguistics experts contend that the word "redskin(s)" is merely an informal term, petitioners' expert notes, credibly, that such a characterization does not address the issue of whether the connotation of 'redskin(s)' in any given instance is negative, neutral or positive. Nor does the characterization of the word "redskin(s)" as informal adequately address the question of why the word appears, on this record, to have entirely dropped out of spoken and written language since, at least, the 1960's, except in reference to respondent's football team.

*Id.* The TTAB, however, reached no further than these observations and did not make a finding of fact on the implication of these omissions by Pro–Football's experts.

Finally, the Board summarized the dictionary results that were in evidence and simply cataloged the evidence without making any specific findings of fact:

Looking to dictionary definitions of the word "redskin(s)," the experts agree that the many dictionaries in evidence, including dictionaries from the time periods when each of the challenged registrations issued, define "redskin" as a Native American person; that one dictionary also defines "Redskin" as respondent's professional football team; and that several dictionaries, dating from 1966 to the present, include usage labels indicating that the word "redskin" is an offensive reference to Native Americans, whereas several dictionaries, dating from 1965 to 1980, do not include such usage labels in defining "redskin." Predictably, the experts' opinions differ as to the significance to be attached to the usage labels, or the lack thereof. *We find these contradictory opinions of little value in resolving this dispute.* Thus, we have considered the dictionary definitions themselves in the context of the entire record.

*Id.* (emphasis added). Again, the Board declined to make specific findings of fact with regard to the experts' different views on the usage labels contained in the dictionary definitions. Instead, of making findings of fact on the significance of these usage labels or their importance, or on usage labels in general, the TTAB simply considered the dictionary definitions, themselves, in the context of its legal analysis, without relying on the experts' opinions. With regard to the linguists' expert deposition testimony, therefore, the TTAB made only five findings of fact. These findings of fact were taken from undisputed portions of the record. The TTAB did not credit one side's experts over another side's experts in making these findings.

b. *The Survey Evidence*

Survey expert Dr. Ivan Ross, President of Ross Research and a former Professor of Marketing and Adjunct Professor of Psychology with the Carlson School of Management of the University of Minnesota testified by deposition in the TTAB proceeding. Defs.' Stmt. ¶ 15. In March of 1996, Dr. Ross conducted a survey for purposes of this case. *Id.* Dr. Ross stated that the purpose of the survey was "to determine the perceptions of a substantial composite of the general population and of Native Americans to the word "redskin(s)" as a reference to Native Americans." *Harjo II*, 50 U.S.P.Q.2d at 1732, 1999 WL 375907. Dr. Ross surveyed three hundred and one American adults and three hundred and fifty-eight Native American adults. *Id.* (observing that both groups included men and women ages 16 and above).

The Native American group was "a stratified sample." *Id.* First, Dr. Ross selected the twenty states with the highest numbers of Native Americans, excluding Alaska and Hawaii. Pl.'s Mot., Ex. 196, Ross Rep., Letter to Ivan Ross from Jim Robinson on "Method of Drawing Sample for Native American Project" at 1. After selecting these twenty states, the Business Research Bureau of the University of South Dakota stratified the counties by percentage of population which is Native American. *Id.* Dr. Ross's polling firm selected the top fifty counties from among all twenty states, for which a random sample was then drawn. *Id.* These counties fell in only thirteen states. *Id.* The final step in getting a sample involved Dr. Ross's polling firm taking precautions against polling only in urban areas. *Id.* at 1–2. The net result was a sample where the top fifty census tracts fell into only twelve states. *Id.* at 2. According to Dr. Ross, the Native American sample reflected "a consistent mix of rural and urban Native Americans; and included both registered members of Indian tribes and non-registered individuals who identified

themselves as Native American." *Harjo II*, 50 U.S.P.Q.2d at 1732–33, 1999 WL 375907.

The survey was constructed as follows: Individuals in both population groups were read a list, in varying order, of the following terms: "Native American," "Buck," "Brave," "Redskin," "Injun," "Indian," and "Squaw." With respect to each term, participants were asked whether or not they, or others, would be "offended" by the use of the term and, if so, why. Dr. Ross testified that he chose these terms as representative of a spectrum of acceptability, positing that, in general, "Native American" would be likely to be considered acceptable and "Injun" would be likely to be considered pejorative. Dr. Ross testified that, for the question, he chose the word "offensive" as most likely to reflect, to those unfamiliar with trademark law, the behavioral concepts embodied in the terms "scandalous" and "disparaging" in the trademark law. Dr. Ross stated that asking participants whether others might be offended is an accepted additional means of obtaining the speaker's opinion, based on the assumption that the speaker may be circumspect in answering a direct question.

*Id.* at 1733, 1999 WL 375907.[13] On the basis of these questions, Dr. Ross found that 46.2% of the general population sample would be personally offended by the use of the term "redskin" and 36.6% of the Native American population sample would be personally offended by the use of the term "redskin." *Id.*

Pro–Football did not conduct its own survey; however, it did provide an expert witness to critique Dr. Ross's survey. *Id.* Dr. Jacob Jacoby, a psychologist and expert in the area of marketing and trademark surveys made a number of criticisms. His critique of the questions asked stated that:

- the questions in the survey were leading and not neutral;
- the lists of words referring to Native Americans contained an insufficient number of terms;
- in using the term "offensive" in its questions, the survey did not illicit the necessary information for a determination under section 2(a);
- asking questions about what others think leads to ambiguous results. *Id.*

Dr. Jacoby's analysis of the sampling procedure led him to conclude:

- the Native American sample was too geographically limited to be representative;
- the method for ascertaining whether a participant is a Native American was flawed;
- the birthday sample method used by Dr. Ross violated the randomness of the survey;[14]

---

13. The two Ross Survey questions were:

 Q: I'm going to say some terms which you might hear someone say when referring to an American Indian person. One or more of these terms may be OFFENSIVE to you when you hear it used, or NONE of them may be offensive to you . . . .
 Q: Would you, yourself, be OFFENDED by the term REDSKIN if you hear that term being used to describe an American Indian person, or would you not be offended, or don't you have an opinion ONE WAY OR THE OTHER about that?
 Pl.'s Stmt. ¶ 89; *see also* Defs.' Opp'n Stmt. ¶ 89 (indicating that the ordering of the survey phrases within the questions were randomized).

14. Dr. Jacoby explained at his deposition the problem with this method. The Ross Survey's polling firm called each house and to ensure randomness asked to speak to the person in the household who was having the next birthday. Pl.'s Mot., Ex. 185, Jacoby Tr. at

- the age requirements for the survey included participants who could not reflect the state of mind of people in 1967; and

- there was a less than 50% response rate to the survey, which rendered it a very weak probability survey. *Id.* at 1733–34, 1999 WL 375907.

In addition, Dr. Jacoby concluded that "you cannot project, as Dr. Ross says, to the Native American population as a whole for several very important reasons." Pl.'s Mot., Ex. 185, Jacoby Tr. at 21–25. First, the Ross Survey excluded those Native Americans living in thirty-six of the forty-eight contiguous states. Pl.'s Stmt. ¶ 96. Second, the survey excluded large numbers of Native Americans living in Alaska and Hawaii. *Id.* ¶ 97. Third, the Ross Survey included counties in only twelve states, the net result being that the Ross Survey represented only two percent of all U.S. counties. *Id.* ¶¶ 98, 100.

Finally, with regard to the tabulation of the results, Dr. Jacoby observed that certain responses were incorrectly tabulated as positive responses. In particular, these incorrectly tabulated results included those responses where the participant stated that his/her response was dependent on the context in which the word was used and those responses indicating that others may be offended. *Harjo II*, 50 U.S.P.Q.2d at 1734, 1999 WL 375907.

These critiques of the Ross survey led Dr. Jacoby to conclude that the survey was completely unscientific. *Id.* In addition,

Dr. Jacoby found the survey flawed because it sought the current views of its participants rather than their perceptions during the relevant time period. *Id.* Finally, Dr. Jacoby observed that the survey was a failure because it did not ascertain the perceptions of those questioned on the use of the word "redskin(s)" in the context of Pro–Football's entertainment services. *Id.*

After detailing the evidence on the surveys, the Board ignored Dr. Jacoby's detailed criticisms and made basically three findings of fact regarding this survey evidence:

1. "After careful consideration of Dr. Ross' testimony, the survey report and the substantial survey data in the record, we find ample support for the viability of the survey methodology used, including the sampling plan, the principal questions asked, and the manner in which the survey was conducted." *Id.*[15]

2. "We find no error in including adults aged 16 and above in the survey, even though the younger participants were not alive, or not adults, at the time of registration of several of respondent's marks herein. Dr. Ross does not represent this survey as anything other than a survey of current attitudes as of the time the survey was conducted." *Id.*

3. "In this regard, we find that the survey adequately represents the views of the two populations sam-

23. If the person with the next birthday was not home then the proper procedure, in Dr. Jacoby's view, was to call that individual back at another time. *Id.* at 24. However, the Ross Survey did not follow this practice and instead of calling the person back, the questioner asked to speak to the person with the next birthday in the house, which, according to Dr. Jacoby, "totally violated, according to all kinds of sample theory, the requirements

for calling what you're doing a probability sample." *Id.*

15. Since the TTAB made a separate finding that the survey results could be extrapolated to the general and Native American populations, the Court does not read the TTAB's use of the term "methodology" as encompassing extrapolation.

pled. While certainly far from dispositive of the question before us in this case, it is relevant and we have accorded some probative value to this survey, as discussed in our legal analysis . . . ." *Id.*

The Board indicated, however, that the Ross survey was "not without flaws." *Id.* In particular, the Board did not accord any weight to the survey results pertaining to the participants' conjecture about the views of others. *Id.* The TTAB also observed that "a survey of attitudes as of the dates of registration of the challenged registrations would have been *extremely* relevant in this case." *Id.* (emphasis added). Additionally, the Board noted that "a survey that considered participants' views of the word 'redskin(s)' as used by respondent, the media and fans in connection with respondent's football team would have been *extremely* relevant." *Id.* (emphasis added).

#### 4. Facts Relating to Pro–Football's Laches Defense

It is not disputed that Defendants were aware of the Washington Redskins team name and the name of the cheerleaders during the relevant time period. Defendant Suzan Shown Harjo, who as born in 1945, admits to being aware of the Washington Redskins team name since she was a child. Pl.'s Stmt. ¶ 17. Defendant Vine Deloria admits that he first knew of the Washington Redskins during World War II. *Id.* ¶ 18. Defendant Norbert Hill testifies in his deposition that he has known of the Washington Redskins since his childhood in the 1950's and 1960's. *Id.* ¶ 19. Defendant Manley Begay testifies in his deposition that he was born August 10, 1954, and became aware of the Washington Redskins at a "very young" age. *Id.* ¶ 20. Defendant William A. Means has watched Redskins games and cheerleaders on tele-

vision at least ten times. *Id.* ¶ 52. Defendant Raymond D. Apodaca has watched football, including Redskins games, since it was televised. *Id.* ¶ 57. Mr. Romero, born in 1966, saw Redskins games on television as a child as well as the Redskinettes cheerleaders. *Id.* ¶ 61. It is also undisputed that Defendants did not file their petition to cancel the registrations of the trademarks until September 10, 1992. In addition, it is also undisputed that during the period of delay, Pro–Football and NFL Properties invested in the trademarks and had increasing revenues during this time frame. *See, e.g., id.* ¶¶ 68, 70, 72–81.

### III. LEGAL STANDARD DISTRICT COURTS USE IN RESOLVING MOTIONS FOR SUMMARY JUDGMENT UNDER RULE 56

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The adverse party's pleadings must evince the existence of a genuine issue of material fact. *Id.* at 247–48, 106 S.Ct. 2505. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party. *Id.; Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987). Mere

allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment. Rather, the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial. *Id.* at 1248–49. The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In the case of a laches claim, a district court enjoys "considerable discretion in determining whether to apply the doctrine of laches to claims pending before it." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir.1999). As a result, appellate courts, even on summary judgment motions review a district court's laches finding under an abuse of discretion standard in cases where no material facts are disputed. *Id.* ("Therefore, while our review of the record is *de novo*, in determining whether there are any disputed issues of material fact, our review of whether the district court properly applied the doctrine of laches is under an abuse of discretion standard."). The Court of Appeals for the District of Columbia Circuit states, however, that "[a] district court's ruling on laches does not qualify for deference if the court applied the wrong legal standard." *Daingerfield Island Protective Soc. v. Lujan*, 920 F.2d 32, 38 (D.C.Cir.1990). Nevertheless, as the Fifth Circuit succinctly observes, "as long as the district court applies the correct legal standard on summary judgment and does not resolve disputed issues of material fact against the nonmovant, its determination of whether the undisputed facts warrant an application of laches is reviewed for abuse of discretion." *National Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 707 (5th Cir. 1994).

## IV. DISCUSSION

The Court first turns to the question of whether the TTAB appropriately concluded that the marks at issue disparage Native Americans or cause them to be brought into contempt or disrepute. The Court next turns to Pro–Football's claim of laches.

**A.** *The Evidence Below is Insufficient to Conclude that During the Relevant Time Periods the Trademarks at Issue Disparaged Native Americans or Brought Them Into Contempt or Disrepute*

Essentially, this appeal presents the question of whether the TTAB's decision that the registered marks "may disparage" Native Americans was supported by "substantial evidence." Under the section 2(a) of the Lanham Act:

> No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it-
>
> (a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage ... persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute....

15 U.S.C. § 1052(a). In reaching its decision, the TTAB concluded that the registrations at issue did not comprise "scandalous matter." *Harjo II*, 50 U.S.P.Q.2d at 1748–49, 1999 WL 375907. That decision has not been appealed and is not before this Court. The TTAB also conflated the "contempt or disrepute" inquiry with the "disparage" inquiry. *Id.* at 1740, 1999 WL 375907. In other words, the TTAB concluded that "the guidelines enunciated [in

its opinion], in connection with determining whether matter in a mark may be disparaging are equally applicable to determining whether such matter brings 'persons, living or dead, institutions, beliefs, or national symbols into contempt or disrepute.'" *Id.* (quoting 15 U.S.C. § 1052(a)). None of the parties argue that the TTAB's decision to treat "disparage" in the same manner as "contempt or disrepute" was error. Therefore, the Court has not reviewed this legal determination and in assessing the TTAB's decision, only reviews whether the marks at issue "may disparage" Native Americans, which includes whether the marks bring Native Americans into contempt or disrepute.

Pursuant to section 14 of the Lanham Act "any person who believes that he is or will be damaged by the registration of a mark" may file a petition to cancel a registration "[w]ithin five years from the date of the registration of the mark," or "[a]t any time ... if its registration was obtained fraudulently or contrary to the provisions of ... subsection (a), (b), or (c) of section 1052 of this title ...." 15 U.S.C. § 1064. Section 21 of the Lanham Act entitles persons authorized to appeal to bring either a civil action in a federal district court or a direct appeal if they are dissatisfied with the decision rendered by the TTAB in a cancellation proceeding. 15 U.S.C. § 1071. By undertaking a civil action, as opposed to a direct appeal to the Federal Circuit, the parties acknowledge that "[t]he testimony and exhibits of the record in the Patent and Trademark Office, when admitted, shall have the same effect as if originally taken and produced in the suit." *Id.* § 1071(b). Moreover, this Court is not precluded from adducing further factual development of the record. *Id.*[16]

## 1. Standard of Review

■ After reviewing the arguments of the parties, particularly those of Defendants who advocate that the Court adopt a "clearly erroneous/thorough conviction" standard of review, Tr. 7/23/2003 at 56, the Court determines that its review of the TTAB's findings shall be commensurate with the "substantial evidence" standard of review articulated in the APA. In other words, the Court will reverse the TTAB's findings of fact only if they are "unsupported by substantial evidence." 5 U.S.C. § 706. The United States Supreme Court recently held that in the context of a review of a decision of the PTO in the Federal Circuit, the Federal Circuit was to apply the standard of review articulated in the APA. *Dickinson v. Zurko*, 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (reversing *en banc* decision of the Federal Circuit which held that "clearly erroneous" was the appropriate standard of review). Although the Supreme Court in *Zurko* left open which of the APA's review standards were appropriate, the Federal Circuit has since concluded that the APA's "substantial evidence" test is the appropriate review standard for findings of fact of the agency. *In re Gartside*, 203 F.3d 1305, 1315 (Fed.Cir.2000). In addition, the Federal Circuit has concluded that despite the fact that *Zurko* involved the Federal Circuit's review of a decision of the PTO, the Supreme Court's holding is applicable to findings of fact made by the TTAB. *Recot, Inc. v. Becton*, 214 F.3d 1322 (Fed.Cir. 2000); *see also On–Line Careline Inc. v. America Online, Inc.*, 229 F.3d 1080, 1085 (Fed.Cir.2000) ("Nothing in these statutes suggests that the TTAB should receive any less deference on factfinding than the BPAI.").

---

**16.** As discussed *supra,* neither of the parties have submitted new evidence on the question of whether the TTAB's finding of disparagement was supported by substantial evidence.

As a result of the fact that *Zurko* only applied to the review of the PTO by the Federal Circuit, courts have been somewhat divided on the question of whether a district court uses the APA "substantial evidence" standard of review for the TTAB's fact-finding. Nevertheless, in the Court's judgment, the better authority holds that district courts should also use the substantial evidence standard from the APA.[17] *See Mazzari v. Rogan,* 323 F.3d 1000, 1005 (Fed.Cir.2003) ("Therefore, a reviewing court, *whether this court or the district court,* applies the 'substantial evidence' standard of review to findings of fact made by the board.") (emphasis added); *CAE, Inc. v. Clean Air Engineering,* *Inc.,* 267 F.3d 660, 675 n. 9 (7th Cir.2001) ("Furthermore, whether the aggrieved party elects direct review by the Federal Circuit or initiates a new action in the district court, both courts should apply the APA standard of review to the TTAB's fact-finding."); *but see U.S. Filter Corp. v. Ionics, Inc.,* 68 F.Supp.2d 48, 52 (D.Mass. 1999) ("I do not accept defendant's argument that *Zurko* has changed the standard of review that this court must apply in reviewing the PTO's finding of a valid patent.").[18]

The substantial evidence standard requires the reviewing court to ask whether a "reasonable mind might accept" a particular evidentiary record as "adequate to

17. The Supreme Court observed that it could find no opinion where a court stated that the difference between the "clearly erroneous" standard and the "substantial evidence" standard would have produced a different outcome. *Zurko,* 527 U.S. at 162–63, 119 S.Ct. 1816. Based on this statement, Defendants argue that there is no difference in practice between the two approaches. Defs.' Opp'n at 6 (difference is "likely [to] be meaningless"); Tr. 7/23/2003 at 56. Defendants' argument is erroneous for two principal reasons. First, the Supreme Court said there is a difference between the two standards. *Zurko,* 527 U.S. at 162, 119 S.Ct. 1816 ("The upshot in terms of judicial review is some practical difference in outcome depending upon which standard is used. The court/agency standard, as we have said, is somewhat less strict than the court/court standard."). Second, the Supreme Court only observed that it could not find any case where a court had stated that a different outcome would result from the use of different standards-not that the standards themselves were indistinguishable. *Id.* at 163–63, 119 S.Ct. 1816 (observing that the difference is a "subtle one").

18. In *Material Supply International v. Sunmatch Industrial Co.,* 146 F.3d 983, 989–90 (D.C.Cir.1998), the Court of Appeals for the District of Columbia Circuit stated the standard of review applicable to a district court's review of a decision of the TTAB:

Although courts sometimes refer to the district court's review of the TTAB's decision as a *"de novo"* proceeding, *see, e.g., Spray-*

*ing Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 391 (7th Cir.1992); *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.,* 332 F.2d 216, 218 (2d Cir.1964), that is something of a misnomer:

While district court review is called *"de novo"* because new evidence may be introduced, it is a unique procedure because unlike a true de novo proceeding, findings of fact made by the [TTAB] are given great weight and not upset unless new evidence is introduced which carries thorough conviction.

3 [J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*] § 21:21, at 21–26 [(4th ed.1997)].

*Material Supply,* 146 F.3d at 990. Although this Court cited the *Material Supply* standard in its December 11, 2000, Opinion, *Material Supply* predates the Supreme Court's holding in *Zurko* and, therefore, in this Court's judgment no longer states the appropriate legal standard for reviewing the TTAB's findings of fact. While the Court's December 11, 2000, Memorandum Opinion quoted the "thorough conviction" standard in the text of the opinion, it referenced the Supreme Court's recent decision in a footnote. *Harjo III,* 57 U.S.P.Q.2d at 1142 n. 2, 2000 WL 1923326. At that time, the issue was not ripe for resolution. After reflection on the case law and briefing on the subject, the Court finds that the substantial evidence test is the appropriate standard of review.

support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Zurko*, 527 U.S. at 162, 119 S.Ct. 1816. Considered to be less deferential than the "arbitrary, capricious" standard, *see Gartside*, 203 F.3d at 1312, the "substantial evidence" standard requires a stricter judicial review of agency fact-finding than the "arbitrary, capricious" approach. *On–Line Careline*, 229 F.3d at 1085–86; *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."); *Zurko*, 527 U.S. at 162, 119 S.Ct. 1816 (observing that the Supreme Court has "stressed the importance of not simply rubber-stamping agency fact-finding") (citing *Universal Camera*, 340 U.S. at 490, 71 S.Ct. 456). The Supreme Court has stated that "[s]ubstantial evidence is more than a mere scintilla." *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206; *id.* at 230, 59 S.Ct. 206 (finding that "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence"). A review for substantial evidence "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Gartside*, 203 F.3d at 1312 (citing *Universal Camera*, 340 U.S. at 487–88, 71 S.Ct. 456).

### 2. The TTAB's Disparagement Conclusion is a Question of Fact

■ The Court concludes that the ultimate question of whether the six trademarks at issue "may disparage" Native Americans is a question of fact. Accordingly, Pro–Football bears a burden of sub-

mitting evidence or argument that the TTAB's decision on disparagement was not supported by substantial evidence. However, with regard to the legal standards applied in the proceeding below, the Court reviews the TTAB's conclusions on these issues *de novo*.

As discussed *supra*, the TTAB's findings of fact are reviewed under the substantial evidence test. However, while the Court is unable to find any helpful precedent on point, it would appear that, by analogy, there is a dispute in authority as to whether the "ultimate" question about whether a trademark "may disparage" would be treated as one of fact or one of law. The parties have not directly addressed this question in their papers. The Federal Circuit has held that the question of whether a trademark is scandalous under section 2(a) of the Lanham Act is treated as a question of law. *In re Mavety Media Group Ltd.*, 33 F.3d 1367, 1371 (Fed.Cir. 1994) ("The determination that a mark comprises scandalous matter is a conclusion of law based upon underlying factual inquiries.... Therefore, while we review the Board's underlying fact findings for clear error, we review de novo the Board's ultimate legal conclusion of scandalousness."). In making this decision, the Federal Circuit analogized to cases involving "likelihood of confusion" scenarios.

The Court's research reveals, however, that the courts of appeals are split over whether, in the context of "likelihood of confusion" cases, the "ultimate" question as to whether the trademarks are similar is one of fact or of law. *Compare Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir.1985) ("the question of likelihood of confusion is all fact and no law"), *with Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir.1999) ("Likelihood of confusion is a mixed question of fact and law. After a bench trial,

we review a trial court's underlying factual findings for clear error but review *de novo* whether these facts indicate a likelihood of confusion.") (internal citation omitted). The majority view, that the question is a pure question of fact, is considered to be "the better view." Restatement (Third) of Unfair Competition § 21 cmt. m (1995).

The Court agrees with the majority view. Whether the six trademarks disparage Native Americans is ultimately a fact-bound conclusion that rests with the fact-finder in the first instance. For example, had this been an original proceeding in this Court, the Court would have referred the question of whether the trademarks were disparaging to a jury. The issue of disparagement, like the issue of likelihood of confusion, requires a fact-based judgment that depends heavily on the particular circumstances of each case. The Third Circuit compellingly explained why a court should defer to a trial court's findings of fact in a likelihood of confusion case, which, by analogy, accurately reflects the situation that the Court currently faces:

At the threshold we must determine the standard of appellate review applicable to a trial court's findings as to likelihood of confusion or lack thereof. This is an issue over which the courts of appeals have disagreed in the past. *See Elby's Big Boy of Steubenville, Inc. v. Frisch's Restaurants, Inc.*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) (White, J., dissenting from denial of certiorari). Some courts have reviewed findings concerning likelihood of confusion under the "clearly erroneous" standard applicable to questions of fact, *see, e.g., Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377 (1st Cir.1980), while other courts, characterizing likelihood of confusion as

a question of law, have engaged in *de novo* review of such findings, *see, e.g., Blue Bell, Inc. v. Jaymar–Ruby, Inc.*, 497 F.2d 433, 435 n. 2 (2d Cir.1974). To the extent that the latter approach rests on the perception that appellate courts are in as good a position as trial courts to evaluate evidence of likelihood of confusion, the validity of this approach has been largely undermined by the 1985 amendment to Federal Rule of Civil Procedure 52(a). *See Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427–29 (7th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986). This amendment made clear that a district court's conclusions cannot be regarded as pertaining to a "question of law"-and thus reviewed *de novo*-merely because they are based on evidence that is theoretically susceptible of independent evaluation by an appellate court. Rule 52(a) now requires appellate courts to apply the clearly erroneous standard to all findings of fact, "whether based on oral or documentary evidence."

*American Home Products Corp. v. Barr Laboratories, Inc.*, 834 F.2d 368, 370 (3d Cir.1987). The Court finds the Third Circuit's reasoning persuasive. Accordingly, the Court reviews the "ultimate" question of whether the trademarks at issue "may disparage" Native Americans under the substantial evidence test.[19]

Defendants correctly argue, therefore, that in this proceeding, "Pro–Football bears the burden of demonstrating that the TTAB's findings were unsupported by substantial evidence." Defs.' Opp'n at 4 (citing *Trans Union Corp. v. F.T.C.*, 245 F.3d 809, 814–15 (D.C.Cir.2001); *Cleary Gottlieb Steen & Hamilton v. Dep't of*

---

19. In the context of this particular case, however, as noted *infra*, it makes no practical difference to the Court's ultimate resolution of this case whether the review of this issue is under the substantial evidence test or is *de novo*.

*Health and Human Services,* 844 F.Supp. 770, 783 (D.D.C.1993)). The Court of Appeals for the District of Columbia Circuit in *Trans Union* re-affirmed the common understanding that a party making a substantial evidence challenge to an agency's decision has a responsibility to articulate why each particular finding is unsupported by substantial evidence. *Trans Union,* 245 F.3d at 815 ("To bring a substantial evidence challenge [to an agency's decision, a party] . . . must identify the specific findings it challenges and demonstrate that each finding is either unsupported by evidence or, because the Commission unreasonably discounted contrary evidence, unsupported by 'the record in its entirety.' ") (quoting *Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456).[20]

Pro–Football, however, argues that the Court of Appeals' decision in *Material Supply* compels a different result. Pl.'s Reply at 17 (citing *Material Supply,* 146 F.3d at 990). In the context of a district court review of a decision of the TTAB, the United States Court of Appeals for the District of Columbia Circuit stated:

> Because the TTAB decided against [Plaintiff] and [Plaintiff] sought review of that decision in district court, we think [Plaintiff] had the burden of going forward, that is, of submitting to the court evidence or argument to counter the decision of the TTAB. Nevertheless, because [Defendant] had the burden of proof before the TTAB *and because the district court must review the TTAB's decision* de novo, *[Defendant] must bear the burden of persuasion in district court.*

*Material Supply,* 146 F.3d at 990–91 (emphasis added). The proceedings in *Material Supply* differ from the instant proceedings, however, because that case

involved a District Court's review of a TTAB's summary judgment decision. *Id.* at 990. A review of the TTAB's summary judgment conclusion, like any legal decision of the TTAB, is reviewed under a *de novo* standard of review. In this case, however, the proceedings below were not decided on summary judgment motions, and as such, the TTAB, sitting as a finder of fact, must be awarded the deference befitting the procedural posture of this case.

Unquestionably, the Court reviews *de novo* the TTAB's decisions regarding the appropriate legal standards to apply to the case. *See In re International Flavors & Fragrances, Inc.,* 183 F.3d 1361, 1365 (Fed.Cir.1999) ("We review the Board's legal conclusions, such as its interpretation of the Lanham Act, 15 U.S.C. § 1051, *et seq., de novo*."). Accordingly, the legal standards used to make a finding of disparagement and any other questions of law are reviewed by this Court *de novo.*

\* \* \* \* \* \*

The Court now turns its attention to the opinion of the TTAB in this case. The Court first analyzes the TTAB's sporadic attempts at findings of fact. These findings of fact, as discussed *supra,* are reviewed under the substantial evidence test. The Court then turns its attention to the legal principles adopted by the TTAB to help it resolve this case. The Court reviews the TTAB's legal principles *de novo.* Finally, the Court returns to the TTAB's application of the legal principles to its findings of fact and its determination that these findings demonstrate by a preponderance of the evidence that the trademarks at issue may disparage Native Americans. As the Court has indicated, it

**20.** Interestingly, Defendants' reliance on *Trans Union* would seem to undercut their argument that the substantial evidence test does not apply to this proceeding.

must review this decision under the substantial evidence test outlined above.

### 3. The TTAB's Findings of Fact

The Court's review of the TTAB's findings of fact is limited by necessity given the paucity of actual findings of fact made by the TTAB. Even though it spent fourteen pages cataloging the evidence in the case, *Harjo II,* 50 U.S.P.Q.2d at 1721–34, 1999 WL 375907, the TTAB made specific findings of fact in only two areas: (1) linguists testimony, *id* at 1731–32, 1999 WL 375907, and (2) survey evidence, *id.* at 1734, 1999 WL 375907; *see also id.* at 1721, 1999 WL 375907 ("[E]xcept for the testimony and related exhibits of the parties' linguistics experts and marketing and survey experts, we summarize the testimony and related exhibits of, first, petitioners' witnesses and, second, respondent's witnesses."). Since the TTAB only made specific findings of fact in two areas, it is only these two areas that are subject to court-scrutiny under the substantial evidence test. Therefore, the Court passes, at this stage, on ruling on Pro–Football's objections that much of the evidence admitted by the TTAB was inadmissible. These objections are best considered in the context of the legal framework, which the Court discusses, *infra.*

#### a. *TTAB's Findings of Fact Regarding Linguists' Testimony*

The TTAB only found with regard to the linguists' testimony that the term "redskin(s)" has been used historically as a reference for Native Americans and is still, understood in many contexts as a reference to Native Americans. *Id.* at 1731, 1999 WL 375907. In addition, the TTAB found that since the–mid–1960's to the present, the term "redskin(s)" appears often only as a reference for the professional football club known as the Washington Redskins, that the term has not been used to refer to Native Americans during this time frame, and that the words "Native American," "Indian," and "American Indian" have been used as a reference for Native Americans during this time frame. *Id.* The TTAB also found that until the middle of this century, Native Americans were often referred to in spoken and written language in a derogatory manner. *Id.* While many of these usage examples refer to Native Americans as Indians, the TTAB concluded that these terms had remained an acceptable reference for Native Americans during the second half of the twentieth century. *Id.*

In making specific findings of fact in this area, the TTAB culled from the evidentiary record findings of fact that were not disputed by the experts of each of the parties. Aside from the question of the relevance of these findings to the legal question presented by this case, *see infra,* it is impossible to say that these specific findings of fact are not supported by substantial evidence.

#### b. *TTAB's Findings Regarding Dr. Ross's Survey*

█ The Board basically made three findings of fact regarding this survey evidence. First, the Board found that the survey methodology was sound. *Id.* at 1734, 1999 WL 375907. Second, the TTAB found that the survey was nothing more than "a survey of current attitudes as of the time the survey was conducted." *Id.* Finally, the Board concluded that the survey adequately represents the views of the two populations sampled." *Id.*

First, the Court finds that there is substantial evidence for the narrow conclusion that the survey represents nothing more "than a survey of current attitudes at the time the survey was conducted." *Id.* This fact does not appear disputed by either

side and therefore it would be difficult for the Court to conclude that this conclusion was not supported by substantial evidence.

In regard to the TTAB's decision that the survey methodology used was appropriate, the Court finds that there is substantial evidence to show that this methodology supported a survey that did nothing more "than survey ... current attitudes." *Id.* However, to the extent that the TTAB's finding purported to hold that the methodology was proper to extrapolate the survey results to the Native American population at large, the Court must disagree that substantial evidence supports this conclusion.

First, the TTAB's opinion presents no defense to the critique by Dr. Jacoby that the survey improperly extrapolated the views of its respondents to the Native American population as a whole. *See id.* As discussed earlier, a review for substantial evidence "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Gartside*, 203 F.3d at 1312 (citing *Universal Camera*, 340 U.S. at 487–88, 71 S.Ct. 456). Instead of explaining why Dr. Jacoby's critique was flawed, the Board concludes-with no explanation-that the survey "represents the views of the two populations sampled." *Id.* Dr. Jacoby's criticisms, while listed by the TTAB, are never engaged. They are simply cast aside with an empty phrase such as "no survey is perfect." This case is not one where Dr. Jacoby testified before the TTAB and the TTAB members could observe the demeanor of this witness and reach conclusions as to whether to credit his testimony. The evidence for both Drs. Ross and Jacoby was on a cold record which ordinarily would require an explanation as to why evidence is credited or rejected. As discussed *supra*, Dr. Jacoby presented a highly detailed criticism of

this survey's attempts at extrapolation. For example, Dr. Jacoby noted that the Ross Survey included Native Americans living in only twelve states, was deficient because it excluded large numbers of Native Americans living in Alaska and Hawaii, and was flawed because the survey included only two percent of all the counties in the United States. While the agency listed Dr. Jacoby's criticisms it never addressed them or rebutted them. Left completely unexplained, the Court cannot accept that the Ross Survey is a sufficient proxy for the views of Native Americans as a whole.

In this vein, the Court observes that in setting forth Dr. Jacoby's critiques again in their Rule 7.1(h) statement, Pro–Football essentially presented the Defendants with the opportunity to rebut the serious problems with the attempts of the survey to measure the attitudes of Native Americans as a whole. However, the Defendants merely responded by stating, "The Native American Parties do not dispute that Dr. Ross did not conduct a nationwide sample. The Ross Report explains the basis for Dr. Ross' methodology." Defs.' Opp'n Stmt. ¶¶ 95–97; *see also id.* ¶¶ 98–100. The glaring problem with this approach is that while the Ross Expert Report lays out the methodology used in the survey, it does not address Dr. Jacoby's critique that the survey is incapable of being extrapolated, which is a different issue. *See* Pl.'s Mot., Ex. 196, Ross Rep. at 4–5

Finally, during the July 23, 2000, motions hearing, counsel for the Defendants stated, "If you take our survey evidence which says that 36 percent of Native Americans believe that the term is offensive to themselves, then that number come to somewhere between 700 and 800,000, using the number that [Pro–Football's counsel] gave us of 2.41 million Native

Americans today." Tr. 7/23/2003 at 61. The Court immediately questioned the Defendants' counsel over this figure. This colloquy followed:

> THE COURT: ... I'm trying to figure out where you came from 36 percent out of the survey to 700 and 800,000. MR. LINDSAY: Well, that's just plain arithmetic. THE COURT: I know. But what does it represent? I understand you did the arithmetic. But what I'm saying is, aren't you—you're extrapolating that if 36 percent of the group of the survey felt this way, you then applied 36 percent to the whole population that are Native Americans. Is that accurate? MR. LINDSAY: Yes. THE COURT: And making an assumption, aren't you, then, that that is representative of what all the rest of them would feel? MR. LINDSAY: We're certainly saying that the survey that the TTAB accepted and rejected the methodological critique of the opposition, that that survey would say that yes, those views would hold for the Native American population, in general, if that's Your Honor's question.

Tr. 7/23/2003 at 61–62. Thus, even when presented with an opportunity to defend the extrapolation, the Defendants' counsel merely relied on the TTAB's decision to find that the survey represented the views of Native Americans as a whole. Moreover, the Defendants' counsel had no scientific basis for the extrapolation. Rather, at the hearing, he merely multiplied the percentages of the Ross Survey by the number of Native Americans allegedly living in the United States. While this might be a proper technique, there is no evidence in the record that this was how Dr. Ross

arrived at his conclusion. There is also no evidence in the record as to the overall number of Native Americans who would share the view that the word "redskin(s)" was offensive to themselves. In fact, there is no discussion in either the Ross Report or the decision of the TTAB about the aggregate number of Native Americans that would find the term "redskin(s)" offensive when used as a reference for Native Americans.

The Court, therefore, concludes that the TTAB's decision to extrapolate the results of the Ross Survey to the Native American population as a whole was not supported by substantial evidence. Critiques by Dr. Jacoby went unanswered in the TTAB opinion. Conclusory statements such as "no survey is perfect" do not assist the Court in understanding the basis for accepting Dr. Ross's decision to extrapolate his results to the Native American population as a whole. Indeed, counsel at the July 23, 2003, motions hearing came up with the extrapolation figure on the spot by doing "plain arithmetic" based on information not in the record For all of these reasons, the Court concludes that the decision of the TTAB to extrapolate the Ross Survey results to the Native American population as a whole is not supported by substantial evidence.[21]

### 4. The TTAB's Legal Analysis

The legal standards applied by the TTAB to the evidence in this case is reviewed by this Court *de novo*. After reviewing the decision of the TTAB, the relevant authority, and the parties' pleadings, the Court finds that the TTAB cor-

---

**21.** To the extent that the conclusion regarding extrapolation implicates Dr. Ross's methodology, the Court finds that the TTAB's decision that Dr. Ross's methodology was sound to not be supported by substantial evidence. Regarding the remainder of the Ross Survey's methodology, the Court has no occasion to reach the question of whether the TTAB's decision to accept it was supported by substantial evidence. The Court would point out that Dr. Jacoby's criticisms in this regard also went unanswered.

rectly articulated the law to apply to disparagement cases.

### a. *The Burden of Proof at the TTAB Level*

█ The Court determines that the TTAB correctly held Defendants/Petitioners to a "preponderance of the evidence" standard, *Harjo II*, 50 U.S.P.Q.2d at 1735 n. 90, 1999 WL 375907, rather than a "clear and convincing evidence" standard suggested by Pro–Football, Pl.'s Reply at 16.[22] In other words, Defendants/Petitioners at the agency level needed to demonstrate by a preponderance of the evidence that the challenged trademarks "may disparage" Native Americans or "bring them into contempt, or disrepute."

Pro–Football challenges this assertion by arguing that Defendants need to prove their case by "clear and convincing evidence." Pl.'s Reply at 15–16. In the usual course, a petitioner seeking a cancellation before the TTAB needs to prove his or her case by a preponderance of the evidence. *Material Supply*, 146 F.3d at 990 (citing various authority). Pro–Football observes however that the clear and convincing evidence standard was employed in the case of *Woodstock's Enters., Inc. v. Woodstock's Enters., Inc.*, 43 U.S.P.Q.2d 1440, 1997 WL 440268 (Trademark Tr. & App. Bd.1997). Pl.'s Mot. at 16 n. 18. However, the use of the "clear and convincing" evidence stan-

dard in *Woodstock's Enters.* was employed because the cancellation of the trademark was premised on fraud in the application. *Woodstock's Enters.*, 43 U.S.P.Q.2d at 1443, 1997 WL 440268 ("It does appear that the very nature of the fraud requires that it be proven 'to the hilt' with clear and convincing evidence."). This case does not involve any allegations of fraud in the application and, therefore, *Woodstock's Enters.* is inapplicable.[23] Pro–Football also cites to *Eurostar, Inc. v. "Euro–Star" Reitmoden Gmbh & Co.*, 34 U.S.P.Q.2d 1266, 1995 WL 231387 (Trademark Tr. & App. Bd.1995) to support its position that a "clear and convincing" evidentiary standard should apply. Pl.'s Mot. at 16 n. 18. However, in *Eurostar* the court suggested the "clear and convincing" evidentiary standard because the case involved a cancellation of a trademark due to abandonment. *Eurostar*, 34 U.S.P.Q.2d at 1273, 1995 WL 231387 (Simms, administrative trademark judge, concurring) ("Moreover, we should keep in mind that abandonment is generally regarded as a forfeiture of rights and the courts and the Board have required strict or clear and convincing proof before finding abandonment."); *but see Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1024 (Fed.Cir.1989) (applying preponderance of the evidence standard to abandonment proceeding). As the instant case does not involve an abandonment of the trademark

---

**22.** If the Court were reviewing the TTAB's decision on disparagement *de novo*, Pro–Football would encourage the Court to apply the "clear and convincing evidence" standard to this proceeding as well. However, the Court has determined that the TTAB's decision on disparagement is a question of fact reviewed under the substantial evidence test and therefore Defendants do not have the same burden that they had before the Board.

**23.** The Court disagrees with Pro–Football's assertion that because both a fraud case and a disparagement case involve assessing a situa-

tion at the time a registration was made, a "clear and convincing" standard is required. Pl.'s Reply at 17. As the Court in *Woodstock's Enters.* observed, it is *"the very nature of the fraud* [that] requires that it be proven 'to the hilt' with clear and convincing evidence." *Woodstock's Enters.*, 43 U.S.P.Q.2d at 1443, 1997 WL 440268 (emphasis added). Given that fraud involves an allegation of a proof of an intent to deceive, courts require a heightened standard of proof-not, as Plaintiff's allege, because the Court needs to review evidence of something that occurred in the past.

at issue, *Eurostar* is equally inapplicable. Finally, Pro–Football vaguely alleges that because its First Amendment interests are at stake, clear and convincing evidence is required. Pl.'s Mot. at 16 n. 18 (citing *Gertz v. Robert Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). This Court has delayed ruling on the constitutional questions and even putting that aside, *Gertz* involved a libel claim, which as Defendants point out, is similar to a claim of fraud in that it requires a heightened standard of proof. Defs.' Opp'n at 5 n. 1.

Instead, of a "clear and convincing evidence" standard, the Court concludes that a "preponderance of the evidence" standard applied to the Defendants' burden during the TTAB proceeding. *Harjo II*, 50 U.S.P.Q.2d at 1735 n. 90, 1999 WL 375907. Unfortunately, the TTAB failed to remark that in the context of cancellation proceedings where a lengthy period of time ensues between registration and the cancellation request, the Board is required to pay even closer attention to the proof adduced to buttress the cancellation request. A popular and oft-cited commentary on trademarks observes:

> The registrant in a cancellation proceeding is entitled to the prima facie presumption that the registration and the mark are valid, that registrant is the owner and that registrant has the exclusive right to use the mark. Thus, cancellation of a valuable registration around which a valuable business good will has been built, should be granted only with "due caution and after a most careful study of all the facts." The Court of Customs and Patent Appeals has stated that in cancellation proceedings:

> The defendant [respondent] in such proceedings is one who has obtained substantial rights from the Government upon or about which he may have built a large and, of course, legitimate business. The cancellation of one's trademark [sic] may prove destructive to the business built about it. Surely, no registration should be cancelled hastily and without a most careful study of all the facts.

3 McCarthy, *supra*, § 20:64, at 117–18 (footnotes omitted) (cited with approval in *Material Supply*, 146 F.3d at 989–90). Moreover, as the Court of Customs and Patent Appeals once said, "the longer a party waits, after the time for bringing an opposition has expired, to commence a cancellation proceeding, the greater may be the number of facts (e.g., evidence of actual confusion) to be considered in determining the quantum of proof required." *Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 1402 (Cust. & Pat. App.1974).

The TTAB's decision is silent on whether it paid cautious heed to the admonition that in proceedings where a party has waited longer to bring a cancellation petition, that party has a very serious burden of making its case, even though the standard of proof is not technically different and remains "a preponderance of the evidence." Nevertheless, the Board stated that it applied the preponderance of the evidence standard and that is all that the case law requires. Therefore, reviewing *de novo* the decision of the TTAB, the Court finds that the preponderance of the evidence standard adopted by the Board in the proceedings below was appropriate.[24]

---

**24.** Although Pro–Football relies on *United States Filter Corp.* for the proposition that a "clear and convincing" standard applies, the Court finds that case inapplicable because it was a patent infringement proceeding, which differs from the instant cancellation proceeding. Pl.'s Reply at 16 (citing *United States Filter Corp.*, 68 F.Supp.2d at 52); *see also*

### b. The Meaning of "May Disparage"

■ After acknowledging the dearth of precedent to guide their hand in interpreting the disparagement clause of section 2(a), *Harjo II*, 50 U.S.P.Q.2d at 1737, 1999 WL 375907, the TTAB approached the task as it would a charge of scandalousness under section 2(a). *Id.* No party disputes this approach and the Court finds no error in treating the two as similar for purposes of developing a conceptional framework. First, the TTAB has not conflated the two approaches and has made sure to note differences where appropriate. Second, the TTAB has noted the dearth of legislative history on the disparagement provision in section 2(a). *Id.* at 1737 n. 98, 1999 WL 375907. Given the lack of legislative history as a guide, and the TTAB's efforts to adjust the scandalousness framework for the disparagement inquiry, the Court finds no error in the TTAB's approach.

The TTAB first defined the term "disparage" in accordance with the ordinary and common meaning of the term. *Id.* From this review, the Board concluded that the trademarks may disparage if they may "dishonor by comparison with what is inferior, slight, deprecate, degrade, or affect or injure by unjust comparison." *Id.* The Board then observed that unlike the inquiry into whether a trademark is scandalous, where the test looks to the reaction of American society as a whole, a disparagement test is much more circumscribed and is limited by section 2(a) of the Lanham Act. *Id.* The TTAB stated that "it is only logical that in deciding whether the matter may be disparaging we look, not to American society as a whole, ... but to the views of the referenced group." *Id.* at 1739, 1999 WL 375907. The views of the referenced group, the Board concluded, are "reasonably determined by the views of a substantial composite thereof." *Id.* (citing *In re Hines*, 31 U.S.P.Q.2d 1685, 1688, 1994 WL 456841 (Trademark Tr. & App. Bd. T.A.B.1994), *vacated on other grounds* 32 U.S.P.Q.2d 1376, 1994 WL 587037 (Trademark Tr. & App. Bd.1994)). To determine the referenced group, the TTAB adopted the test from *In re Hines*, which looks to "the perceptions of 'those referred to, identified or implicated in some recognizable manner by the involved mark.'" *Id.* at 1740, 1999 WL 375907 (quoting *Hines*, 31 U.S.P.Q.2d at 1688, 1994 WL 456841) ("In determining whether or not a mark is disparaging, the perceptions of the general public are irrelevant. Rather, because the portion of section 2(a) proscribing disparaging marks targets certain persons, institutions or beliefs, only the perceptions of those referred to, identified or implicated in some recognizable manner by the involved mark are relevant to this determination.").[25] As the parties have not objected to this approach and because this approach is often used in cancellation

McCarthy, *supra*, § 20:64 ("The Federal Circuit has stated that because a presumption of validity attaches to the registered mark, the party seeking cancellation must rebut this presumption by a preponderance of the evidence.") (citing *West Fla. Seafood v. Jet Restaurants*, 31 F.3d 1122, 1125 (Fed.Cir.1994); *see also Cerveceria Centroamericana*, 892 F.2d at 1023).

**25.** The Board observed that the question of "[w]ho comprises the targeted, or relevant, group" must be answered "on the basis of the facts in each case." *Harjo II*, 50 U.S.P.Q.2d at 1739, 1999 WL 375907 ("For example, if the alleged disparagement is of a religious group or its iconography, the relevant group may be the members and clergy of that religion; if the alleged disparagement is of an academic institution, the relevant group may be the students, faculty, administration, and alumni; if the alleged disparagement is of a national symbol, the relevant group may be citizens of that country.").

proceedings, the Court does not find legal error in applying it to this proceeding.

In addition, the TTAB concluded that the addition of the term "may" before the word "disparage" in the Lanham Act was to "avoid an interpretation of this provision which would require an intent to disparage." *Id.* at 1738, 1999 WL 375907 (noting that such an interpretation shifts the focus to whether the matter may be perceived as disparaging). This conclusion is also not disputed by the parties.

■ Most importantly, the TTAB pointed out that "the question of disparagement must be considered in relation to the goods or services identified by the mark in the context of the marketplace." *Id.* (citing *Doughboy Indus., Inc. v. The Reese Chem. Co.*, 88 U.S.P.Q. 227, 1951 WL 4167 (1951)). In the *Doughboy* case, the Examiner-in-Chief of the Patent Office observed, "that a trade mark was unregistrable if it was scandalous by reason of the particular goods in connection with which it was used [and t]his same interpretation, it is believed, should also apply to section 2(a) of the new Act, not only in connection with scandalous matter, but also in connection with matter which may disparage persons." *Doughboy Indus., Inc.*, 88 U.S.P.Q. at 228, 1951 WL 4167. In *Doughboy*, the Patent Office denied the registration for DOUGH–BOY for an anti-venereal preparation. *Id.* at 227, 1951 WL 4167. The Patent Office observed that the mark DOUGH–BOY, a name for American soldiers in World War I, was disparaging *in connection with* an anti-venereal prophylactic preparation; particularly given its packaging which featured depictions of American soldiers. *Id.* at 228, 1951 WL 4167. Based on this case, the TTAB appropriately concluded that:

> To ascertain the meaning of the matter in question, we must not only refer to dictionary definitions, but we must also consider the relationship between the subject matter in question and the other elements that make up the mark in its entirety; the nature of the goods and/or services; and the manner in which the mark is used in the marketplace in connection with the goods and/or services.

*Harjo II,* 50 U.S.P.Q.2d at 1739, 1999 WL 375907. The Court finds no error in this approach.

c. *Determining if a Trademark is Disparaging*

■ The Court concludes that the TTAB correctly stated the test for disparagement and neither of the parties specifically dispute this approach. The Board stated:

> [O]ur analysis is essentially a two-step process in which we ask, first: What is the meaning of the matter in question, as it appears in the marks and as those marks are used in connection with the services identified in the registrations? Second, we ask: Is this meaning one that may disparage Native Americans? As previously stated, both questions are to be answered *as of the dates of registration of the marks herein.*

*Id.* at 1741, 1999 WL 375907 (emphasis in original). Since the oldest trademark in this case was issued in 1967 and the newest was issued in 1990, the Board "focus[ed its] determination of the issue of disparagement on the time periods, between 1967 and 1990, when the subject registrations issued." *Id.* None of the parties contest this approach and the Court finds no error in the TTAB's articulation of this test for disparagement.

5. **The TTAB's Finding of Disparagement**

■ The Court concludes that the TTAB's finding that the marks at issue "may disparage" Native Americans is un-

supported by substantial evidence, is logically flawed, and fails to apply the correct legal standard to its own findings of fact. With no material facts in dispute, the Court finds that Defendants' motion for summary judgment must be denied, and that Pro–Football's motion must be granted as to the Counts I and II of the Complaint. The Court will first turn to the TTAB's discussion of the "meaning of the matter in question," and then will focus on the TTAB's decision that the matter "may disparage" Native Americans.[26]

### a. *Meaning of the Matter In Question*

The Court concludes that substantial evidence exists in the record to support the TTAB's finding that "when considered in relation to the other matter comprising at least two of the subject marks and as used in connection with [Pro–Football]'s services, 'Redskins' clearly both refers to respondent's professional football team and carries the allusion to Native Americans inherent in the original definition of that word." *Id.* at 1742, 1999 WL 375907 (noting that this conclusion is equally applicable to the time periods encompassing 1967, 1974, 1978 and 1990, as well as to the present time"). The TTAB began its analysis by focusing on the word "redskin(s)" as it appears in each of the six challenged trademarks. *Id.* at 1741, 1999 WL 375907. The TTAB observed that one denotive meaning of the word was a Native American person. *Id.* The TTAB observed that dictionary definitions and articles that refer to the word "redskin(s)" in connection with Native Americans indicate the term has remained a denotive term for Native Americans from the 1960's to the present. *Id.; see also id.* n. 109, 1999 WL 375907. The TTAB, however, also agreed with Pro–Football that "there is a substantial amount of evidence in the record establishing that, since at least the 1960's and continuing to the present, the term 'Redskins' has been used widely in print and other media to identify [Pro–Football's] professional football team and its entertainment services." *Id.* at 1741, 1999 WL 375907.

Nevertheless, the TTAB observed that, in focusing on the manner in which Pro–Football's trademarks were actually used in the marketplace, the Washington Redskins football club used Native American imagery throughout its logos and team imagery. *Id.* at 1741–42, 1999 WL 375907. The TTAB found that although the record disclosed that the vast majority of the use of the term "redskin(s)" in the media and press since the 1960's refers to the Washington football club, "it would be both factually incomplete and disingenuous to ignore the substantial evidence of Native American imagery used by [Pro–Football], as well as by [Pro–Football's] fans, in connection with [Pro–Football's] football team and its entertainment services." *Id.* at 1742, 1999 WL 375907. Indeed, the TTAB noted that two of the registered marks include a portrait of the profile of a Native American and what presumably is a Native

---

**26.** It is important to point out that the TTAB rejected the Defendants' argument that the use of Native American references or imagery by non-Native Americans is *per se* disparaging to Native Americans. *Harjo II,* 50 U.S.P.Q.2d at 1743, 1999 WL 375907. This decision has not been appealed. In addition, because the evidence below tended to revolve exclusively around the disparaging nature of the term "redksin(s)," there was "very little evidence or argument" related to the portrait of a Native American or the Native American spear in Pro–Football's trademarks. *Id.* Given this lack of evidence, the TTAB concluded that the Defendants' had not established that the picture of the Native American and the Native American spear "may disparage" Native Americans. *Id.* This finding has also not been appealed.

American spear. *Id.* Given this situation the TTAB remarked:

> This is not a case where, through usage, the word "redskin(s)" has lost its meaning, in the field of professional football, as a reference to Native Americans in favor of an entirely independent meaning as the name of a professional football team. Rather, when considered in relation to the other matter comprising at least two of the subject marks and as used in connection with respondent's services, "Redskins" clearly both refers to respondent's professional football team and carries the allusion to Native Americans inherent in the original definition of that word.

*Id.* Based on the record before the TTAB, the Court finds that this conclusion is supported by substantial evidence.

b. *Whether the Matter in Question May Disparage Native Americans*

The Court determines that the TTAB's conclusion that the six trademarks may disparage Native Americans is not supported by substantial evidence. The Board began by correctly articulating the question before it as "whether the word 'redskin(s)' may be disparaging of and to Native Americans, as that word appears in the marks in the subject registrations, in connection with the identified services, and during the relevant time periods." *Id.* at 1743, 1999 WL 375907. In answering this question and rendering its opinion, the Board made a number of initial statements that are problematic.

In rendering its decision, the TTAB stated that "we consider the broad range of evidence in this record as relevant to this question either *directly* or by inference." *Id.* (emphasis added). The difficulty with this statement is transparent. Even a cursory review of the TTAB's findings of fact reveals that there is no *direct*

evidence in the findings that answers the legal question posed by the TTAB. None of the findings of fact made by the TTAB tend to prove or disprove that the marks at issue "may disparage" Native Americans, during the relevant time frame, especially when used in the context of Pro-Football's entertainment services. For example, none of the findings of fact related to the linguistic testimony tended to directly prove that the marks at issue "may disparage" Native Americans as used in connection with Pro-Football's football club during the relevant times at issue. Indeed, the TTAB said it was unable to resolve the dispute between the linguists related to the connotation of the word "redskin(s)" as used in Pro-Football's team name. *Id.* at 1731, 1999 WL 375907. Moreover, even if the Court considers all of the findings of fact related to the survey evidence, the survey is not directly dispositive of the legal question before the TTAB because it asked participants for views about the word "redskin(s)" as a reference for Native Americans in 1996. The survey did not test the participants' view of the term "redskin(s)" in the context of Pro-Football's services and it did not measure the attitudes of the survey participants as they were held during the relevant time periods. While the TTAB noted that such information would have been "extremely relevant," *id.* at 1743, 1999 WL 375907, the fact remains that the TTAB did not have what would be considered "direct" or circumstantial evidence before it, or evidence from which it could draw reasonable inferences for such a conclusion.

Second, in finding that the trademarks "may disparage" Native Americans, the TTAB stated that "[n]o single item of evidence or testimony alone brings us to this conclusion; rather, we reach our conclusion *based on the cumulative effect of the entire record.*" *Id.* at 1743, 1999 WL 375907 (emphasis added). The troubling

aspect of this statement is that the Board made findings of fact in only two very specific areas; and many of these findings of fact simply summarized undisputed testimony. As a result, many of the TTAB's findings of fact never involved weighing conflicting evidence or addressing criticisms of some of the evidence. The TTAB compounded this problem by declining to make specific findings of fact in key areas. *See, e.g., id.* at 1731, 1999 WL 375907 ("To some extent, this testimony is self-serving and the opinions of the different individuals seem to negate each other's assertions, which offsets whatever probative value could be attributed to this portion of their testimony."). The result of this approach is that the TTAB reached its decision to cancel the trademarks inferentially, by piecing together bits of limited, undisputed evidence from the record. Even though the Court defers to the TTAB's inferences under the rubric of a substantial evidence review, the TTAB's approach is flawed because as will be demonstrated *infra,* the inferences are predicated on assumptions that are not contained anywhere in the record.

As the Court explains *infra,* the decision of the TTAB cannot withstand even the deferential level of judicial scrutiny provided by the substantial evidence test. While a *de novo* test to the TTAB's findings of fact might have led to an immediate reversal, due to the paucity of actual findings of fact, the substantial evidence test counsels otherwise and requires that the Court not substitute its judgment for that of the TTAB. Instead, the Court reviews point-by-point whether "substantial evidence" supports the TTAB's disparagement finding.

(1) *Equating the Views of the General Public with Those of Native Americans*

In rendering its decision, the TTAB stated that "[w]e have considered the perceptions of both the general public and Native Americans to be probative [to determining if the marks at issue 'may disparage']." *Id.* at 1743, 1999 WL 375907. The TTAB went on to state:

> For example, we have found that the evidence supports the conclusion that a substantial composite of the general public finds the word "redskin(s)" to be a derogatory term of reference for Native Americans. *Thus, in the absence of evidence to the contrary, it is reasonable to infer that a substantial composite of Native Americans would similarly perceive the word.* This is consistent with the testimony of the petitioners.

*Id.* at 1743–44, 1999 WL 375907 (emphasis added). The problem with this approach is manifest.

First, and most importantly, the Ross survey indicates that the views of the general populace and the Native American population are distinct. *Id.* at 1733, 1999 WL 375907 (36.6% of Native Americans view the term "redskin" offensive as a term of reference for Native Americans, compared to 46.2% for the general population). Thus, the evidence before the TTAB indicated that the views of the Native Americans on this issue were not congruent with that of the population as a whole.

Second, the legal question before the TTAB only pertained to whether a "substantial composite" of Native Americans would conclude that the term "redskin(s)" may disparage. As the Board itself stated only five pages earlier in its opinion, "it is only logical that, in deciding whether the matter may be disparaging, *we look, not to American society as a whole,* as determined by a substantial composite of the general population, but to the views of the referenced group." *Id.* at 1739, 1999 WL

375907 (emphasis added); *id.* (quoting *Hines,* 31 U.S.P.Q.2d at 1688, 1994 WL 456841) ("'In determining whether or not a mark is disparaging, *the perceptions of the general public are irrelevant.'*") (emphasis added). By concluding that the views of the general public were probative, the TTAB erred. By focusing on the general public and inferring that the Native Americans would simply agree with those views, the TTAB made a decision unsupported by substantial evidence.

Third, outside the testimony of the seven Native Americans who brought suit, the TTAB cited no independent or additional evidence to support its conclusion. Defendants clearly do not constitute a "substantial composite" of Native Americans. From this testimony it was impossible for the Board to reasonably corroborate its decision to equate the views of the American public with the views of the Native American population.

Fourth, the TTAB reached this conclusion only because there was an "absence of evidence to the contrary," *id.* at 1744, 1999 WL 375907, thus, completely shifting the burden of proof in the wrong direction. This is not a case of the TTAB simply crediting unrebutted evidence. Indeed, the Ross survey and other evidence clearly demonstrates that the views of Native Americans do not necessarily correlate with the views of the general population. At the very least, there was other evidence in the record that the TTAB ignored in making this finding.[27] Since Defendants had the burden of proving their case by a preponderance of the evidence in the proceeding below, the TTAB, by making this statement, impermissibly shifted the burden to Pro–Football. Consequently, the Court is unable to conclude that this finding is supported by substantial evidence.

### (2) *The Derogatory Nature of the Word "redskin(s)"*

The TTAB began by discussing the term "redskin(s)," decoupled from Pro–Football's entertainment services. Putting aside the relevance of this sojourn into linguistics, the Board concluded that "the word 'redskin(s)' has been considered by a substantial composite of the general population, *including by inference Native Americans,* a derogatory term of reference for Native Americans during the time period of relevance herein." *Id.* at 1746, 1999 WL 375907 (emphasis added). As the Court has already explained, the TTAB's decision to conflate the views of the general population with those of Native Americans cannot be supported by substantial

---

**27.** The statement by the TTAB that there was no evidence to the contrary is belied by the fact that Pro–Football had introduced two news articles as evidence in the proceeding below that Native Americans use the term "redskin(s)" interchangeably with the term "Indian" as a reference for Native Americans. Pl.'s Opp'n at 32 (citing Pl.'s Stmt. ¶¶ 273, 287). The TTAB did not indicate in its opinion that it was not crediting this evidence. Although not considered by the TTAB in the record below, it certainly is not fair to say that there was no evidence in the record to support a contrary view. While the Defendants object to these news articles on reliability and hearsay grounds, *see* Def.'s Opp'n Stmt. ¶¶ 273, 287, and in the case of one of the articles on the ground that the writer was being "sarcastic," *id.* ¶ 273, these articles certainly could have been considered by the Board according to the Defendants' own arguments. Indeed, it is the Defendants who vociferously argue that "the Federal Rules of Evidence do not apply to agency proceedings," Defs.' Opp'n at 7, in seeking to persuade the Court that even evidence inadmissible under the federal rules can be considered "substantial evidence." Thus, under the Defendants' own logic the Board could have considered this evidence and it was error for the Board to say that there was no evidence to the contrary on this point without addressing this evidence in some manner.

evidence. Nevertheless, even a review of the evidence that supports this conclusion leads the Court to conclude that the TTAB's finding on this point was not supported by substantial evidence. The Court examines this evidence in turn.

### (a) Dictionary Evidence

In support of the proposition that the term "redskin(s)" was a derogatory term for Native Americans, the TTAB first turned its attention to the dictionary definitions that were in evidence. As discussed *supra*, the TTAB had refused to make findings about the expert testimony surrounding the definitions and therefore only had the dictionary definitions, themselves, to consider. The TTAB observed that half of the dictionaries in the record contained a usage label indicating, for example, that the word "redskin(s)" is "often offensive," "informal," or "offensive slang." Half of the dictionaries did not have any usage labels. Based solely on this evidence, the TTAB wrote that "from the fact that usage labels appear in approximately half of the dictionaries of record at any point in the time period covered, we can conclude that a not insignificant number of Americans have understood 'redskin(s)' to be an offensive reference to Native Americans since at least 1966." *Id.* at 1744, 1999 WL 375907.

There are a number of concerns that the Court has with this conclusion. First, the TTAB expressly found that it would not make findings on the conflicting linguistic expert testimony that related to the "significance to be attached to the usage labels, or the lack thereof." *Id.* at 1732, 1999 WL 375907. Even though it made this statement, the TTAB still made a finding about the significance to be attached to the usage labels in the dictionary. The TTAB's conclusion is without any basis because there is no evidence in the record that was credited as to the purpose and methodology for including or not including usage labels in dictionaries or an explanation as to the basis for their conclusion. There are no findings of fact to support the TTAB's conclusion; rather, it is mere speculation on the part of the TTAB that this is the case.

Second, the fact that a "not insignificant number of Americans have understood "redskin(s)" to be an offensive reference to Native Americans," has nothing to do with whether Native Americans, themselves, consider the term "offensive," which would obviously be more probative or relevant. Third, the dictionary evidence only states that the term "redskin(s)" is "often offensive," which, as Pro–Football observes, means that in certain contexts the term "redskin(s)" was not considered offensive. Pl.'s Mot. at 27. In fact, the TTAB concluded that the term "redskin(s)" means both a Native American and the Washington-area professional football team. The fact that it is usually offensive may mean the term is only offensive in one of these contexts. There is not a discussion of this possibility in the TTAB's opinion. Moreover, as Defendants' own expert observed, "[d]isparaging and offensive are two different words and mean two different things." Pl.'s Stmt. ¶ 124.

Finally, the dictionary evidence was, at best, equivocal. The TTAB observed in a footnote that:

> In view of the contradictory testimony of the parties' linguistics experts regarding the significance of a lack of usage label for a dictionary entry, we cannot conclude that the lack of such labels in the other excerpts of record establishes that the word "redskin(s)" was *not* considered offensive during the relevant time period.

*Harjo II*, 50 U.S.P.Q.2d at 1744 n. 114, 1999 WL 375907 (emphasis in original).

By the same token, however, the conflicting linguist expert testimony should not necessarily lead to a finding that usage labels establish that the term "redskin(s)" was necessarily considered offensive by the American public. Accordingly, the Court finds that the TTAB's findings related to the significance of the dictionary evidence are not supported by substantial evidence.

#### (b) Historical Evidence

The TTAB next deviated into a lengthy discussion of the history of the term "redskin(s)." The TTAB observed that it had found that during the late 1800's and early 1900's that the vast majority of evidence which included the word "redskin(s)" as a reference for Native Americans, portrayed Native Americans in a "derogatory manner." *Id.* at 1744, 1999 WL 375907.[28] The TTAB then observed that the evidence demonstrates that by the 1930's through the late 1940's the word "redskin(s)" as a reference for Native Americans "reflect[ed] a slightly less disdainful, but still condescending, view of Native Americans." *Id.* at 1745, 1999 WL 375907. However, the TTAB then states that "[f]rom the 1950's forward, the evidence shows, and neither party disputes, that there are minimal examples of uses of the word 'redskin(s)' as a reference to Native Americans." *Id.* During this same time period the TTAB noted that the record reflects "significant occurrences of the word 'redskin(s)' as a reference to [Pro-Football's] football team." *Id.* From this latter evidence, the TTAB stated:

> [W]e conclude from the evidence of record that the word "redskin(s)" does not appear during the second half of this century in written or spoken language, formal or informal, as a synonym for "Indian" or "Native American" because it is, and has been since at least the 1960's, perceived by the general population, which includes Native Americans, as a pejorative term for Native Americans.

*Id.* The Court determines that this finding is also not supported by substantial evidence because no concrete evidence supports this conclusion.

First, the TTAB agreed with Pro-Football, that "the pejorative nature of 'redskin(s)' in the early historical writings of record comes from the overall negative viewpoints of the writings." *Id.* Despite this finding, the TTAB merely assumed that because the term "redskin(s)" dropped out of use as a term for Native Americans it must have been because the term was derogatory. There is no evidence in the record to support this finding one way or the other. Concerned with adopting witness testimony that reached the ultimate legal question, the TTAB did not make findings regarding the significance of the use of the word from the 1960's onward. *Id.* at 1731, 1999 WL 375907. However, the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services and during the relevant time frame. The ultimate legal inquiry is not whether the term "redskin(s)" is a pejorative term for Native Americans. Accordingly, the

---

28. Although the TTAB found that the expert testimony was undisputed on this point, *Harjo II*, 50 U.S.P.Q.2d at 1731, 1999 WL 375907, it appears that this testimony was not completely undisputed, *id.* at 1744 n. 116, 1999 WL 375907 (observing that Pro-Football's expert found the term to be used in a neutral, if not positive, fashion). The TTAB disagreed, without explanation, with Pro-Football's expert. Although not particularly relevant ultimately to the Court's conclusion, the Court observes that the TTAB completely failed to recognize this testimony while discussing the historical evidence.

TTAB's reluctance to make findings in this area deprives the Court of meaningful review. There is no evidence to support the conclusion that the drop-off of the use of the term "redskin(s)" as a reference for Native Americans is correlative with a finding that the term is pejorative. Accordingly, the Court finds that this finding is unsupported by substantial evidence.[29]

(c) Survey Evidence

As discussed earlier, the Court found the TTAB's conclusion that the survey could be extrapolated to the Native American population as a whole to be unsupported by substantial evidence. Nevertheless, to the extent that the survey would be even included in the calculus, the Court determines that it does not support the TTAB's decision that the word "redskin(s)" was viewed by a substantial composite of Native Americans to be a derogatory term of reference for Native Americans from the mid–1960's to 1990. The survey measures attitudes of Native Americans about their perceptions of the term "redskin" as used as a reference to Native Americans in *1996*. The survey, therefore, is entirely irrelevant to the question before the Board.

As the TTAB itself observed, "[n]either [the fact that the survey measured the views of individuals not alive at the time of registration of certain of the trademarks or the fact that the survey did not consider participants' views of the word 'redskin(s)' as used in connection with Pro–Football's entertainment services] diminishes the value of petitioners' survey for what it is—a survey of *current* attitudes towards the word "redskin(s)" as a reference to Native Americans." *Id.* at 1734, 1999 WL 375907 (emphasis added). The TTAB has no evidence, therefore, to draw a conclusion that during the relevant time periods, i.e. 1967, 1974, 1978, and 1990, the term Native Americans was a pejorative term for Native Americans.[30] Putting aside the fact that the survey results have no bearing on Native Americans perceptions of the term "redskin(s)" as used in connection with the Pro–Football's professional sports team, the survey tells us nothing about the relevant time frame.[31] Accordingly, it fails to

**29.** The TTAB also stated:

> We find the context provided by Dr. Hoxie's historical account, which [Pro–Football] does not dispute, of the often acrimonious Anglo–American/Native American relations from the early Colonial period to the present to provide a useful historical perspective from which to view the writings, cartoons and other references to Native Americans in evidence from the late 19th century and throughout this century. *Harjo II*, 50 U.S.P.Q.2d at 1745, 1999 WL 375907 (footnote omitted). The Court agrees with Pro–Football, that this testimony is plainly irrelevant to the legal question before the TTAB. *See* Pl.'s Mot. at 22–23. There is no question that the history of the treatment of Native Americans in this country has been tragic. Nevertheless, the history of Native Americans has nothing to do with whether the trademarks at issue may disparage Native Americans in the context of Pro–Football's services and during the relevant time frame

Furthermore, the TTAB expressly declined to make findings of fact regarding Dr. Hoxie's testimony.

**30.** Indeed, during this time frame, several different PTO examiners reviewed the Redskins marks and none came to the conclusion that the trade marks were disparaging. *See* 15 U.S.C. § 1052(a); Pl.'s Opp'n at 32–33.

**31.** For example, while a word like "redskin(s)" may have been accepted as an informal term for a Native American in 1967, by 1996, attitudes of people may have changed as Native American culture became increasingly accepted and respected. The TTAB addressed this argument in a footnote stating that Pro–Football "has presented no evidence suggesting that, as a term identifying Native Americans, the perception of the derogatory nature of the word 'redskin(s)' by any segment of the general population, including Native Americans changed significantly during

support with substantial evidence the TTAB's finding that the term "redskin(s)" is viewed by a substantial composite of Native Americans as a derogatory term for Native Americans.[32]

### (3) The Word "redskin(s)" as a Term of Disparagement

The TTAB next turned to the ultimate inquiry before the Board and found that "within the relevant time periods, the derogatory connotation of the word 'redskin(s)' in connection with Native Americans extends to the term 'Redskin(s)' as used in [Pro–Football's] marks in connection with the identified services, such that [Pro–Football's] marks may be disparaging of Native Americans to a substantial composite of this group of people." *Id.* at 1748, 1999 WL 375907. The crux of the TTAB's conclusion, therefore, is that the "derogatory connotation of the word 'redskin(s)'" extends to the term "Redskin(s)" as used in connection with Pro–Football's entertainment services. This finding is not supported by substantial evidence.

To reach its conclusion that the trademarks may disparage Native Americans, the TTAB essentially determined that because the *word* "redskin(s)" may be viewed by Native Americans as derogatory when used as a reference for Native Americans, the trademarks are disparaging because they use that word. The result of this analysis is that there is very little discussion of the use of the mark in connection with Pro–Football's product or services. Unlike in the *Doughboy* case, where the Examiner–in–Chief of the Patent Office stated that use of the term "Doughboy"-a reference for a World War I soldier-was disparaging when used to sell an anti-venereal prophylactic, *Doughboy*, 88 U.S.P.Q. at 228, 1951 WL 4167, in this case the TTAB did very little analysis of *how* the use of the trademarks in connection with Pro–Football's services disparages Native Americans. The Board was content with stating that because it found the name to be pejorative, the marks must be disparaging.[33]

---

this time period." *Harjo II*, 50 U.S.P.Q.2d at 1746 n. 121, 1999 WL 375907 (observing that the evidence in the record supports the conclusion that the term "redskin(s)" has been viewed by Native Americans a derogatory word since at least the 1960s). The difficulty with the TTAB's statement is that, as the Court has discussed at length in this section, there is no evidence or findings of fact made by the TTAB that a substantial composite of Native Americans view the term "redskin(s)" as derogatory as a reference for Native Americans. Hence, it is not as if the TTAB was crediting some unrebutted testimony in making this finding.

32. The survey evidence, that Native Americans find the term "redskin(s)" offensive as a term for Native Americans, does not even represent a majority of Native Americans polled. Indeed only 36.6% of Native Americans agreed with that statement. While the TTAB found that 36.6% was a substantial composite, *Harjo II*, 50 U.S.P.Q.2d at 1746 n. 120, 1999 WL 375907 (quoting McCarthy, *supra*, § 32.185) (noting that in cases dealing

with likelihood of confusion, "an appreciable number of customers" may be less than a majority), the Court finds that conclusion difficult to support in the context of this case. The survey only found that 131 out of the 358 participants agreed that this term was offensive when used as a reference to Native Americans. This Court, accordingly, finds that the survey results do not demonstrate that a "substantial composite" of Native Americans found the term offensive as a reference for Native Americans.

33. The Board's reasoning reflects the views of Defendants in this case, as the following statement from Defendant Harjo at her deposition makes clear:

Q: Have any actions been taken by the Washington Redskins football team that you believe disparage Native Americans other than the use of the name?
A: The use of their name, the use of that term, colors all their actions in my estimation. And so I find everything disparaging.

First, the TTAB observed that "[a]s we move through the 1960's to the present, the evidence shows increasingly respectful portrayal of Native Americans." *Id.* at 1746, 1999 WL 375907. The TTAB then noted that "*[t]he evidence herein shows a parallel development of [Pro–Football's] portrayal of Native Americans.*" *Id.* (emphasis added). What the TTAB found therefore, was that during the relevant time periods, the use of the term "redskin(s)" in connection with Pro–Football's marks was used in a respectful manner. Nevertheless, despite this stunning observation-that during the relevant time frame Pro–Football used Native American imagery in a respectful manner as connected to its entertainment services—the Board still concluded that the use of the term "redskin(s)" was disparaging when used in the context of Pro–Football's professional football club.

The TTAB apparently premised this conclusion on a number of factors. First, the TTAB discussed the fact that the media has used Native American imagery in connection with Pro–Football's football team, throughout the entire period, "in a manner that often portrays Native Americans as aggressive savages or buffoons." *Id.* at 1747, 1999 WL 375907 (noting newspaper headlines referring to Washington Redskins team, players or managers scalping opponents, seeking revenge on the warpath, holding pow wows, or using pidgin English). In addition, newspaper and video excerpts of games were presented showing Washington Redskins fans dressed "in costumes and engaging in antics that clearly poke fun at Native American culture and portrays [sic] Native Americans as savages and buffoons." *Id.* While the TTAB stated that it agreed with Pro–Football that it was not responsible for the actions of the media or its fans, the

TTAB, nevertheless, found "the actions of the media and fans ... probative of *the general public's* perception of the word 'redskin(s)' as it appears in respondent's marks herein." *Id.* (emphasis added). From this evidence, the TTAB concluded that the term "redskin(s)" "retains its derogatory character as part of the subject marks and as used in connection with respondent's football team." *Id.*

The problem with this reasoning is twofold. First, the perceptions of the general public are irrelevant to determining if the marks are disparaging to Native Americans. In other words, this evidence is simply not relevant to the legal question in the case. Second, and most importantly, this finding is logically flawed. At best, this evidence demonstrates that Pro–Football's fans and the media continue to equate the Washington Redskins with Native Americans and not always in a respectful manner. However, the evidence does not automatically lead the Court to conclude that the word "redskin(s)" as used in Pro–Football's marks is derogatory in character. Under the broad sweep of the TTAB's logic, no professional sports team that uses Native American imagery would be permitted to keep their trademarks if the team's fans or the media took any action or made any remark that could be construed as insulting to Native Americans. The Court cannot accept such an expansive doctrine; particularly when premised on a finding that is not supported by any substantial evidence.

Clearly, the evidence relating to the media and fans has no bearing on whether a substantial composite of Native Americans finds the term "redskin(s)" to be disparaging when used in connection with Pro–Football's marks. In this regard, the evidence the TTAB put forward comes no-

where close to meeting the substantial evidence test. First, the TTAB noted that the record contained the testimony of the Defendants who stated that they were "seriously offended" by Pro–Football's use of the term in connection with its services. *Id.* This testimony, however, is a reflection of their individual viewpoints and there is no evidence that Defendants' views are a reasonable proxy for a substantial composite of the entire Native American population. As Pro–Football's counsel stated at the July 23, 2003, motions hearing, "Do these seven petitioners strongly believe that our famous football team mark Washington Redskins is disparaging? Apparently. That's fine. They have an opinion, but they are representing themselves and no one else. There are 2.41 million Native Americans in this country, Your Honor. There are over 500 Native American tribes. So I ask, can petitioner's opinions, no matter how stridently held, be extrapolated to even one additional Native American by some method acceptable in a courtroom? The answer is, of course, not at all." Tr. 7/23/2003 at 16.

To corroborate its ultimate conclusion, the TTAB cites to other evidence which this Court views as irrelevant because it has no correlation to the relevant time frame at issue and it does not add exponentially to the requirement that the marks, when used in connection with Pro–Football's services, are considered disparaging by a substantial composite of Native Americans. The TTAB noted that the record includes Resolutions indicating a present objection to the use of the word "redskin(s)" in connection with Pro–Football's services, from the National Congress of American Indians ("NCAI"), "a broadbased organization of Native American tribes and individuals" from the Oneida tribe, and from Unity 94, "an organization including Native Americans." All of these resolutions were made after the relevant

time frame, with no explanation by the TTAB as to how they "shed light" on the relevant time period, and thus, are irrelevant to the calculus. *See* Pl.'s Mot. at 23. Indeed, all of these resolutions were adopted after Defendants filed their Petition to Cancel. *Id.* at 24. Moreover, the TTAB made no findings of fact about the strength of this evidence. For example, only two Native Americans voted for the Unity '94 resolution. Pl.'s Stmt. ¶ 212.

In addition, the TTAB relies on "news articles," which appeared at various times from 1969 to 1992, describing Native American objections to the team name. *Harjo II*, 50 U.S.P.Q.2d at 1747, 1999 WL 375907. The TTAB does not describe the contents of these news articles and it is impossible to determine if they would represent a substantial composite of Native Americans. Moreover, these articles were only introduced to demonstrate "the existence of a controversy spanning over a long period of time." *Id.* Again, the existence of a controversy does not inform the Court as to whether the trademarks at issue are perceived of as disparaging by a substantial composite of Native Americans.

Finally, the TTAB relied on a letter written by Harold Gross in 1972 to Edward Bennett Williams, the then-team owner urging the team name be changed. *Id.* at 1747, 1999 WL 375907. The record also indicates that Mr. Gross and seven other colleagues from Native American organizations met with Mr. Williams to discuss the disparaging nature of the team's name. *Id.; see also* Pl.'s Stmt. ¶ 202. Again, this evidence does not represent a "substantial composite" of Native Americans.

The TTAB concluded that "the evidence of record establishes that, within the relevant time periods, the derogatory connotation of the words "redskin(s)" in connec-

tion with Native Americans extends to the term "Redskins," as used in [Pro–Football's] marks in connection with the identified services, such that [Pro–Football's] marks may be disparaging of Native Americans to a substantial composite of this group of people." *Harjo II,* 50 U.S.P.Q.2d at 1748, 1999 WL 375907. The Court determines that this decision is not supported by substantial evidence.[34] As such, the decision of the TTAB must be reversed.

### B. *Pro Football's Defense of Laches Bars Defendants' Challenge*

■ In addition to concluding that the TTAB's finding of disparagement was not supported by substantial evidence, the Court, in the alternative, determines that Pro–Football's defense of laches would also preclude the cancellation of the six trademarks. As the United States Court of Appeals for the District of Columbia Circuit has stated, "Plaintiffs are encouraged to file suits when courts are in the best position to resolve disputes." *NAACP v. NAACP Legal Def. and Educ. Fund, Inc.,* 753 F.2d 131, 137 (D.C.Cir. 1985). The best time to resolve this case was 1967 or shortly thereafter. The net result of the delay is that there is no direct or circumstantial evidence in the record that, at the times the trademarks were registered, the trademarks at issue were disparaging; even though the Native Americans contend that during this entire time period the trademarks were disparaging. Hence, the evidence used by the TTAB to support its disparagement conclusion was purely inferential. The Court, like the TTAB, is handicapped in resolving this case because of the Defendants' delay.

Therefore, the problem of laches correlates, to some degree, with the Court's finding that the TTAB's decision is not supported by substantial evidence. It is for this reason, that the Court has determined to address it in the context of this case.

In its December 11, 2000, Memorandum Opinion, the Court set forth the test for laches that Pro–Football needed to meet in order to prevail:

"The doctrine of laches bars relief to those who delay the assertion of their claims for an unreasonable time. Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *NAACP v. NAACP Legal Defense & Educational Fund, Inc.,* 753 F.2d 131, 137 (D.C.Cir. 1985). Typically, a laches defense arises in trademark matters when a party defends against a trademark infringement claim on the theory that the original trademark holder fumbled away its trademark rights through inattention. In such typical circumstances, the common law allows for a laches defense only if the defendant meets "three affirmative requirements: (1) a substantial delay by a plaintiff prior to filing suit; (2) a plaintiff's awareness that the disputed trademark was being infringed; and (3) a reliance interest resulting from the defendant's continued development of good-will during this period of delay." *Id.*

While the common law definition of laches does not cleanly apply in light of the procedural posture of this case, it can be easily modified: Pro–Football's laches claim is only available under the com-

---

**34.** Moreover, it is undisputed that the six marks at issue were published and registered without opposition from Native Americans or anyone else on *twelve* different occasions. This fact would appear, at least, to work against the TTAB's inferential conclusion that the marks, when used in connection with Pro–Football's entertainment services may disparage Native Americans.

mon law if (1) the Native Americans delayed substantially before commencing their challenge to the "redskins" trademarks; (2) the Native Americans were aware of the trademarks during the period of delay; and (3) Pro–Football's ongoing development of goodwill during the period of delay engendered a reliance interest in the preservation of the trademarks.

*Harjo III*, 57 U.S.P.Q.2d at 1144, 2000 WL 1923326. Pro Football takes the position that the Court "must separately consider the equities of applying laches as to the two-year delay associated with the Redskins' 1990 registration, the fourteen-year delay associated with the 1978 registration, the eighteen year delay associated with the 1974 registrations, and the twenty-five year delay associated with the 1967 registration." Pl.'s Reply at 2. The Court agrees with Pro–Football's assessment. Accordingly, for each of these time periods, the Court must determine if Pro–Football has met the three prong test articulated above. Pro–Football bears the burden of proving laches, because it is an affirmative defense. *Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France*, 245 F.3d 1359, 1361 (Fed.Cir.2001).

#### 1. Laches as an Available Defense

██ Before turning to the three-prong analysis, the Court notes that it finds that laches is a defense available to Pro–Football. Defendants continue to argue that a laches defense is unavailable in the context of a section 2(a) petition for cancellation; particularly where a "public interest" is vindicated. Defs.' Mot. at 34–36. The Court's December 11, 2000, Memorandum Opinion found that laches was an available defense in section 2(a) proceedings, but like all equitable defenses, was contingent on the facts and circumstances of each case. *See Harjo III*, 57 U.S.P.Q.2d at

1145, 2000 WL 1923326 ("The Court agrees with Pro–Football that the Lanham Act does not expressly preclude laches claims raised in opposition to cancellation petitions like that brought by the Native Americans."); *see also id.* (observing that the laches claim should be viewed in the context of each case once a factual record can be developed). The Defendants' arguments do not give the Court pause to reconsider that decision. The Court concludes that on the basis of the unique facts of this case, which arise in the context of a cancellation proceeding, the laches defense applies. In other words, as is appropriate in all laches cases, the Court's holding is specific to the facts and circumstances of this case.

The case that Defendants rely on to argue that laches is inapplicable actually holds that a laches defense is applicable in the context of a section 2(a) petition. *Bridgestone*, 245 F.3d at 1363. The Defendants attempt to read the case, however, as stating that where a "public" interest is involved, laches is unavailable. Defs.' Mot. at 35. The Court disagrees and finds that such an interpretation stretches the words of the Federal Circuit. In *Bridgestone*, the petitioner arguing for cancellation asserted that in a case of "false suggestion," a public interest is involved, and, therefore, a laches defense is inapplicable. *Bridgestone*, 245 F.3d at 1363. The Federal Circuit remarked that false suggestion cases do not involve the public interest. *Id.* The Defendants infer from this statement that in cases where a "public" interest is involved, laches should never apply. The *Bridgestone* court, however, never stated that the laches defense is unavailable in cases involving the public interest. The court merely observed that a "false suggestion" claim did not implicate the public interest.

Defendants also point out that the *Bridgestone* court observed that in the context of section 2(d) likelihood of confusion cases, courts have permitted a "tardy challenge to a registered mark." *Id.* (citing *Ultra–White Co. v. Johnson Chem. Indus., Inc.,* 59 C.C.P.A. 1251, 465 F.2d 891, 893–94 (Cust. & Pat.App.1972); *Chun King Corp. v. Genii Plant Line, Inc.,* 56 C.C.P.A. 740, 403 F.2d 274, 276 (Cust. & Pat.App.1968)). Reviewing these cases, the Court observes that in the likelihood of confusion context, the courts have been generous to tardy filings because of "the public interest expressed in § 1052" which "is the dominant consideration." *Ultra–White,* 465 F.2d at 893–94. Section 2(d) of the Lanham Act states that a trademark should not be cancelled for likelihood of confusion unless the mark, "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, *to cause confusion, or to cause mistake, or to deceive.*" 15 U.S.C. § 1052(d) (emphasis added). Given the strong public interest in avoiding deception or mistake, a court in balancing the equities is likely to be more chary before applying the laches defense in the likelihood of confusion case scenario. Indeed, even in a disparagement case, a court may be willing to invoke the public interest behind section 2(a) before applying it to the facts and circumstances of the case. However, the public interest is somewhat more narrowly defined in that context because it applies to a more narrow segment of the general population than in the likelihood of confusion cases.

The problem with Defendants' argument is that it has no limit. Any public interest that seeks vindication under section 2(a) would not be subject to a laches defense.

As discussed at the July 23, 2003 motions hearing:

THE COURT: So let me see if I understand it, if I can interrupt. Your view, then, is if you are asserting a public interest of this nature, basically it doesn't matter when you bring it. So, if you know that back in 1967 it's disparaging you could decide not to do anything about it and bring it whenever you choose. That's the crux of your argument?

MR. LINDSAY: That is correct, Your Honor.

Tr. 7/23/2003 at 81. The Court cannot agree that the law permits such an unreasonable outcome. Pro–Football has enjoyed trademark protections since 1967. The Seventh Circuit in the *Hot Wax* case captured nicely the problem inherent in the defense counsel's argument, when discussing why a laches claim should apply in Lanham Act cases even if the claim would be viable under the state statute of limitations:

In the context of the Lanham Act, this framework makes particularly good sense. The notion of a "continuing wrong," which is so prevalent in Lanham Act cases, provides a strong justification for the application of the doctrine of laches in appropriate circumstances regardless of whether the plaintiff has brought suit within the analogous statute of limitations. Under the notion of a continuing wrong, "only the last infringing act need be within the statutory period." *Taylor v. Meirick,* 712 F.2d 1112, 1118 (7th Cir.1983). Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely. It would certainly be inequitable to reward this type of dilatory conduct and such conduct would necessarily warrant application of laches in

appropriate circumstances. Thus, we conclude that whether a Lanham Act claim has been brought within the analogous state statute of limitations is not the sole indicator of whether laches may be applied in a particular case.

*Hot Wax*, 191 F.3d at 821–22. The notion that Pro–Football's trademarks would be subject to attack at any point in time would seriously undermine the entire policy of seeking trademark protection in the first place. McCarthy, *supra*, § 2:3 ("Trademarks play a crucial role in our free market economic system. By identifying the source of goods or services, marks help consumers to identify their expected quality and, hence, assist in identifying goods and services that meet the individual consumer's expectations.... [T]rademark counterfeiting ... if freely permitted, ... would eventually destroy the incentive of trademark owners to make the investments in quality control, promotion and other activities necessary to establishing strong marks and brand names. It is this result that would have severe anticompetitive consequences.") (quoting William F. Baxter, Statement before the Senate Committee on the Judiciary concerning S. 2428 (a bill to strengthen the laws against counterfeiting of federally registered trademarks), Sept. 15, 1982). This result is particularly true given the fact that the Defendants claim that the marks have been disparaging during this entire time frame and readily admit that they have been aware of the trademarks during this entire time frame.

For all of these reasons the Court finds that a laches defense is appropriate in a disparagement case. However, as with all equitable defenses, the Court concludes that the defense is subject to the particular facts and circumstances of each case.

\* \* \* \* \* \*

The Court now turns to the merits of Pro–Football's laches argument. The Court articulated a general three-prong test for laches in the context of a trademark proceeding that the Court of Appeals for the District of Columbia Circuit articulated in the *NAACP* case. Essentially, to demonstrate laches Pro–Football must show that Defendants' delay in bringing the cancellation proceeding was unreasonable, and that prejudice to Pro–Football resulted from the delay. *Bridgestone*, 245 F.3d at 1361; *Hot Wax*, 191 F.3d at 820. This test is not materially different from the standard articulated in *NAACP*. The first two steps of the *NAACP* test, substantial delay and notice, form the unreasonable delay prong of the *Bridgestone* case. Finally, the third step of the *NAACP* test, development of goodwill during the period of delay, is the prejudice element in the *Bridgestone* case. As the *Bridgestone* court observed, "[e]conomic prejudice arises from investment in and development of the trademark." *Id.* at 1363.

### 2. Substantial Delay

The Court finds that the Defendants substantially delayed in bringing their challenge to the marks. In the case of the first trademark, Defendants waited over twenty-five years to bring this case. Defendants "do not dispute that they have long known about and objected to the name of the Washington football franchise." Defs.' Opp'n at 23. This length of time is greater than other cases where courts have applied a laches doctrine. *NAACP*, 753 F.2d at 138 (determining that thirteen-year delay was unreasonable and that claim was barred by laches); *Dakota Indus., Inc. v. Dayton Hudson Corp.*, 37 Fed.Appx. 846, 846–47 (8th Cir.2002) (finding that a ten-year delay barred claim). In this case, the Washington Redskins have been using their name since 1937 and

have had their name trademarked since 1967.

The Court finds that for all six trademarks the delay in bringing the cancellation proceeding was substantial. The marks were registered in 1967, 1974, 1978, and 1990. In the case of the trademarks registered in 1967, 1974, an 1978, the delay was substantial on its face. However, given the context of this case, the Court concludes the delay for all the trademarks was substantial. The Defendants had notice of the marks when the marks were published for comment and when the marks were published for registration.

While the two-year delay for the "REDSKINETTES" mark may seem not particularly lengthy on its face, the Court has explained that the context of this case is different from many other trademark cases. In addition, the Washington Redskins cheerleaders have been using the term "REDSKINETTES" since 1962. Therefore, this is not a case where the mark was introduced in 1990; rather, it had been in use for approximately thirty years at the point the Defendants brought their cancellation proceeding. Moreover, the two-year delay does not exist in a vacuum. There are five other trademarks being challenged, all of which contain the term "Redskins." In fact, the TTAB concluded that "[w]hile petitioners have framed their allegations broadly to include in their claim of disparagement all matter in the subject marks that refers to Native Americans, their arguments and extensive evidence pertain almost entirely to the 'Redskins' portion of respondent's marks." *Harjo II,* 50 U.S.P.Q.2d at 1743, 1999 WL 375907. The very first trademark at issue is "The Redskins," and this mark was first registered in 1967. Accordingly, the Court finds that the delay in bringing the instant cancellation proceeding for all of the marks, including the "REDSKINETTES"

mark, first registered in 1990, was substantial. This delay, with no action on the part of the Defendants to challenge the trademarks in a legal proceeding has engendered a presumption that Pro–Football reasonably relied on such inaction. *NAACP,* 753 F.2d at 139 ("The passing of almost thirteen years without any clear reservation of rights by the Association creates a presumption of reasonable reliance.").

### 3. Notice

 The Court determines that Defendants had twelve separate occasions of constructive notice when the six marks were each published and registered. Publication of the marks in the *Official Gazette* constitutes constructive notice of the applications at issue. *National Cable Television Ass'n, Inc. v. American Cinema Editors, Inc.,* 937 F.2d 1572, 1581 (Fed.Cir. 1991) ("Logically, laches begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made. In an opposition or cancellation proceeding the objection is to the rights which flow from registration of the mark."); *see also* 15 U.S.C. § 1072 (Lanham Act provides that registration on the Principle Register "shall be constructive notice of the registrant's claim of ownership"). The TTAB has expanded the Federal Circuit's view to state that laches in the context of a cancellation proceeding begins to run at the date the trademarks are published. *Turner v. Hops Grill & Bar, Inc.,* 52 U.S.P.Q.2d 1310, 1312–13 & n. 3, 1999 WL 959435 (Trademark Tr. & App. Bd.1999) ("laches starts to run when the mark in question is published for opposition"). In this case, therefore, laches began to run from the point the first trademark was published in 1967. In all, therefore, the six marks provided twelve separate constructive notifications.

■ Defendants contend that because they are not a competing claimant to a trademark, they should not be charged with constructive notice. Defs.' Opp'n at 24 ("Unlike a holder of a private and competing trademark, they had no reason to become personally conversant in the details of trademark law and could neither afford nor had the incentive to retain counsel to monitor the publication of trademarks on their behalf."). Contrary to Defendants' argument, the Supreme Court has held that a "party's poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights." *Leggett v. Standard Oil Co.*, 149 U.S. 287, 294, 13 S.Ct. 902, 37 L.Ed. 737 (1893). Additionally, ignorance of one's legal rights is not a reasonable excuse in a laches case. *See, e.g., Jones v. United States*, 6 Cl.Ct. 531, 532–33 (Cl.Ct.1984) ("Where laches is raised, knowledge of the law is imputed to all plaintiffs. Consequently, professed ignorance of one's legal rights does not justify delay in filing suit.").

Defendants seek to strip Pro–Football, a business, of the protections of federal trademark law. As the Court observed of Defendants at the July 23, 2003, motions hearing, "all of them are well educated, some are attorneys." Tr. 7/23/2003 at 77. As Defendants note, laches is an "*equitable*

doctrine." Defs.' Opp'n at 23 (emphasis in original). Given that Defendants are sophisticated individuals who are seeking to strip a corporation of the protections of federal law for its trademarks, the Court is not open to Defendants' argument that because they just learned of their legal rights under section 2(a), that the Court should not follow the constructive notice requirements. If Defendants use of federal trademark laws would cause the same type of damage as a competitor's actions would, then Defendants should be held to the same standards; particularly when they claim that they have been on notice about the disparaging nature of these trademarks since 1967.

The Court finds that Defendants were also aware of the trademarks during the period of delay and therefore also had actual notice. Defendants state in their opposition that they "do not dispute that they have long known about and objected to the name of the Washington football franchise." Defs.' Opp'n at 23. Moreover, as discussed earlier, Defendants have known about the Washington Redskins football franchise for many years.[35]

Accordingly, the Court finds that Defendants were aware of the trademarks during the period of delay under a theory of actual or constructive notice.[36] Based on

---

35. Defendants seek to argue that while aware of the team names, they were unaware of the trademarks. Defs. Opp'n Stmt. ¶ 45. The Court finds the fact that they had knowledge of the use of the team name is sufficient to supply actual knowledge of the trademarks being used in the marketplace.

36. Defendants also argue that the Court cannot apply the doctrine of constructive notice to Defendant Mateo Romero, who was born in 1966. Defendants, in support of this argument, make a fair point of the difficulty of the Court applying laches in the context of a disparagement case, because a " 'substantial composite' " of a disparaged group is by defi-

nition a fluid entity, joined together for the purposes of section 2(a) by a consistent defining concept (disparagement) rather than a constant membership (because individuals in the group are born, age, and die)." Defs.' Opp'n at 25. The argument, however, highlights the fact that during the time periods at issue a substantial composite of Native Americans may not have found the trademark at issue disparaging. A later substantial composite of Native Americans that finds the marks disparaging may be precluded because the relevant test is at the times the trademarks are issued.

Pro–Football correctly observes that the Defendants essentially argue that no court could

the substantial delay, the fact that Defendants were on notice of the marks, and the fact that Defendants have no reasonable excuse for their delay in taking action, the Court concludes that Defendants' delay was undue. *Bridgestone*, 245 F.3d at 1361 ("To prevail on its affirmative defense, Bridgestone was required to establish that there was undue or unreasonable delay . . . ."). As the *Bridgestone* court stated: "constructive notice, widespread commercial use (knowledge of which is not denied by the Automobile Club), and the passing of twenty-seven years after registration, accompanied by the absence of a reasonable excuse by the Automobile Club for its inaction, require that the Automobile Club be charged with undue delay in seeking cancellation of Bridgestone's trademark registration." *Id.* at 1362. The Court finds that constructive and actual notice on the part of Defendants, widespread use of Pro–Football's trademarks, and the over twenty-five years that have passed since first notice of the mark, accompanied by an insufficient excuse from Defendants for their delay, requires this Court to find undue delay on the part of Defendants.

### 4. Prejudice

The Court finds that Defendants' delay in bringing the cancellation proceeding prejudices Pro–Football. Defendants argue that the final prong of the test set forth in *NAACP* is not applicable to the facts of this case because "the Court must look not only to the existence of a reliance interest, but to whether the defendant will be prejudiced if the plaintiff prevails." Defs.' Opp'n at 26 (citing *Bridgestone*, 245 F.3d at 1362). Pro–Football contends, to the contrary, that it "need not prove that it will suffer some negative consequence if the cancellations are sustained." Pls.' Reply at 13 (capitalization altered).

There is no question that in order to prove a laches defense, some form of prejudice must be shown. "Mere delay in asserting a trademark-related right does not necessarily result in changed conditions sufficient to support the defense of laches. There must also have been some detriment due to the delay." *Bridgestone*, 245 F.3d at 1362. The Court reads *NAACP* to suggest this proposition because the case that the *NAACP* relied on to set forth the laches defense, *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir.1980), held that a "[d]efendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, *and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time.*" *Id.* at 1040 (internal quotation marks and citations omitted) (emphasis added); *see also* McCarthy, *supra*, § 31:12 ("The cases are legion to the effect that mere delay, without resulting injury to defendant, is not sufficient to prevent relief for infringement."). The key question, however, is what is required in demonstrating injury or prejudice.

In *Bridgestone*, the Federal Circuit described the prejudice element as "preju-

---

ever apply a laches defense to a disparagement claim. Pl.'s Reply at 6 n. 6 (noting that even a 100–year delay would not prevent a potential disparagement claim "because of the potential of a claim being brought by some as of yet unborn person who might claim disparagement"). The Court, however, has already rejected Defendants' view that laches is inapplicable to a disparagement proceeding. Rather than taking such an extreme position, that laches never applies to a disparagement proceeding, the Court takes a more modest approach: a finding of laches depends on the facts and circumstances of each case.

dice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Bridgestone*, 245 F.3d at 1362.[37] With regard to the question of economic prejudice, the Federal Circuit observed that in trademark cases, unlike patent cases, in order to prove laches a defendant does not need to demonstrate with specific evidence that it relied on the plaintiff's silence. *Id.* at 1363; *see also* McCarthy, *supra*, § 31:13 ("However, the Federal Circuit, citing its own patent precedent, has held that a laches defense in a trademark case can be proven even in the absence of evidence that the registrant actually knew of the potential petitioner and relied to its detriment on that party's failure to challenge the registration or use over a long period of time.") (citing *Bridgestone* ). Instead, as long as a defendant has demonstrated a plaintiff's undue delay, "economic prejudice to the defendant may ensue whether or not the plaintiff overtly lulled the defendant into believing that the plaintiff would not act, or whether or not the defendant believed that the plaintiff would have grounds for action." *Bridgestone*, 245 F.3d at 1363.

Therefore, the test for economic prejudice in a trademark case is the following:

Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir.1999) (the longer the use and the lengthier the period of delay, the lighter the burden of showing eco-

nomic prejudice in support of the defense of laches).

*Id.* at 1363. In other words, prejudice is equated with investment in the trademark that theoretically could have been diverted elsewhere had the suit been brought sooner. *Hot Wax*, 191 F.3d at 824 ("Had Hot Wax successfully pressed its claims in a timely manner, Turtle Wax certainly could have invested its time and money in other areas or simply renamed its products."). Moreover, where the length of time is great in bringing the claim, "prejudice is more likely to have occurred and less proof of prejudice will be required." *Hot Wax*, 191 F.3d at 824 (internal quotation marks and citation omitted); *NAACP*, 753 F.2d at 139 (lengthy passage of time supports presumption of reliance).

There is no dispute that in this case Pro–Football has invested heavily in the marketing and development of its brand during the period of delay. Defs.' Opp'n at 31 ("The Native American Parties acknowledge ... Pro–Football and NFLP's advertising expenditures since 1967, the revenue earned from merchandise bearing the Marks, and their considerable revenue from tickets and TV contracts.") In the instant case, because the delay in bringing the cancellation proceeding was so substantial, a presumption is created that Pro–Football was entitled to rely on the security of the trademarks at issue. In 1967, the NFL was still a nascent industry. Had this suit been brought at that point, Pro–Football may have acquiesced and changed the name. The twenty-five year delay, where Pro–Football has invested so heavily in the marks, has clearly resulted in economic prejudice.

**37.** Because the Court finds economic prejudice, it does not consider whether trial prejudice would also result in this case due to Defendants' undue delay. Nevertheless, the Court points out that defending this lawsuit

against evidence that, due to the twenty-five year delay, does not directly address the legal question at issue, would represent a hardship to Pro–Football.

It is no answer for Defendants to argue that "because cancellation of the registrations does not prohibit Pro Football from using or enforcing the Marks, and the Native American Parties are not seeking to establish control or ownership of the Marks, there is no basis to conclude that Pro Football's past investment or future revenues from the Marks will be jeopardized." Defs.' Opp'n at 31. Defendants' contention would never permit a laches defense in a cancellation proceeding. While Pro–Football's expert points out that it is rare that there will necessarily be a loss of goodwill in the brand name due to a cancellation proceeding because the corporation that has invested so heavily in the mark will likely continue to use it, Pl.'s Opp'n, Ex. 13, Gilson Tr. at 179, 181, past investment in the mark will be jeopardized by uncertainty surrounding the brand name. Therefore, an economic cost exists when a trademark is cancelled that adversely affects prior investment in the brand. *See* Snyder Dep. at 174–75, 190–92, 195–96. Indeed, in addition to caselaw, common sense dictates that Pro–Football will suffer some economic hardship. Otherwise, there would be no point to this litigation being used as a vehicle to force Pro–Football to change the name of the team.[38]

For the foregoing reasons, the Court concludes that based on the undisputed material facts, Pro–Football is entitled to summary judgment on its laches claim. There is no dispute that the record demonstrates both undue delay and economic prejudice. The Court does not adopt Defendants' argument that laches does not apply because of the unique circumstances of this case. Their contention on this score is without reasonable boundaries.

Accordingly, laches bars the Defendants' cancellation petition.

## V. SUMMARY OF ANALYSIS

The Court's decision today only focuses on the evidence supporting the TTAB's decision and Defendants' delay in bringing this proceeding. This opinion should not be read as a making any statement on the appropriateness of Native American imagery for team names. The Board premised its disparagement conclusion on a paucity of actual findings of fact that were linked together through inferential arguments that had no basis in the record. Contrary to the TTAB's ruling, this Court finds that Defendants did not carry their burden of proof in the TTAB proceeding. The evidentiary findings of the TTAB did not rise to the level of "substantial evidence" to support their ultimate conclusion that the six trademarks at issue were disparaging to a substantial composite of Native Americans.

The legal question before the TTAB was whether the six trademarks, when used in connection with Pro–Football's entertainment services, "may disparage" a substantial composite of Native Americans at the time the marks were registered starting in 1967. The findings do not come close to shedding any light on the legal inquiry. There is no evidence in the record that addresses whether the use of the term "redskin(s)" in the context of a football team and related entertainment services would be viewed by a substantial composite of Native Americans, in the relevant time frame, as disparaging. In addition, none of the TTAB's findings related to the linguists' expert testimony help explain

---

**38.** The deposition of Daniel Snyder, which the Court has reviewed, indicates that there are a number of practical reasons why loss of trademark protection would have a detrimental effect on Pro–Football's other revenue streams. Snyder Dep. at 174–75; 190–92; 195–96 (observing loss of sponsorships due to uncertainty over trademarks).

whether the term "redskins," when used in connection with the "Washington Redskins" football team, disparaged Native Americans during the relevant time frame.

The only other findings of fact that the TTAB made involved the Ross survey. The TTAB found that the survey methodology was sound, that the survey was nothing more than a survey of attitudes as of the time the poll was conducted in 1996, and that the survey adequately represents the views of the two populations sampled. This survey, aside from its extrapolation flaws, says nothing about whether the term "redskin(s)" when used in connection with Pro–Football's football team disparages Native Americans. Furthermore, the survey provides no information about the relevant time periods. The survey is completely irrelevant to the analysis.

Besides making findings of fact that did not address the legal conclusion, the TTAB did not hear live testimony; instead the TTAB predicated its decision on a cold factual record. With the reasoning laid entirely out in front of it, the TTAB rarely credited one side's evidence at the expense of another or provided an explanation as to why it accepted the evidence or the weight it gave the evidence. In this case, the TTAB could have easily articulated its reasoning based on the substance of the record before it. Ultimately, the evidence in the case does not answer the legal question of whether the trademarks, in the context of their use during the relevant time frames, may have disparaged Native Americans. The evidence chips away at the sides of this legal question but never helps answer it directly.

This is undoubtedly a "test case" that seeks to use federal trademark litigation to obtain social goals. The problem, however, with this case is evidentiary. The Lanham Act has been on the books for many years and was in effect in 1967 when the trademarks were registered. By waiting so long to exercise their rights, Defendants make it difficult for any fact-finder to affirmatively state that in 1967 the trademarks were disparaging.

## VI. CONCLUSION

The TTAB's finding of disparagement is not supported by substantial evidence and must be reversed. The decision should also be reversed because the doctrine of laches precludes consideration of the case. Accordingly, the Court grants summary judgment for Plaintiffs on their First, Second, and Fifth Causes of Action. The Court denies summary judgment to Defendants on these Causes of Action. As the Court has no need to reach the constitutional claims raised by Pro–Football, these claims are rendered moot.